NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-8288

THE STATE OF OHIO, APPELLEE, *v*. MOORE, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Moore,* Slip Opinion No. 2016-Ohio-8288.]

*Criminal law—Eighth Amendment prohibition against cruel and unusual punishments—United States Supreme Court's holding in* Graham v. Florida *prohibiting imposition of sentences of life imprisonment without parole on juvenile nonhomicide offenders also prohibits imposition on juvenile nonhomicide offender of term-of-years prison sentence that exceeds offender's life expectancy—Eighth Amendment's prohibition of life imprisonment without parole or its practical equivalent for juvenile offenders is not limited to juveniles who commit a* single *nonhomicide offense—Court of appeals abused discretion in denying appellant's application for reconsideration—Court of appeals' judgment reversed and cause remanded.*

(No. 2014-0120—Submitted February 4, 2015—Decided December 22, 2016.)

APPEAL from the Court of Appeals for Mahoning County,

No. 08 MA 20, 2013-Ohio-5868.

_____

**PFEIFER, J.**

{¶ 1} We decide in this case whether the United States Supreme Court's holding in *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), prohibiting the imposition of sentences of life imprisonment without parole on juvenile nonhomicide offenders also prohibits the imposition of a term-of-years prison sentence that exceeds the offender's life expectancy on a juvenile nonhomicide offender. We hold that pursuant to *Graham*, a term-of-years prison sentence that exceeds a defendant's life expectancy violates the Eighth Amendment to the United States Constitution when it is imposed on a juvenile nonhomicide offender.

## FACTUAL AND PROCEDURAL BACKGROUND
### Moore's Crimes

{¶ 2} The facts of this case do not engender a sense of sympathy for appellant, Brandon Moore. Moore embarked on a criminal rampage of escalating depravity on the evening of August 21, 2001, in Youngstown. He was then 15 years old. Early that evening, Moore robbed at gunpoint Jason Cosa and Christine Hammond in the driveway of Cosa's home. Cosa and Hammond saw Moore get into an awaiting dark, older automobile as he fled the scene.

{¶ 3} Later that night, at around 10:20, M.K., a 21-year-old student at Youngstown State University, arrived for her night-shift job at a group home for mentally handicapped women. While removing some things from the trunk of her car, she noticed a black car driving up the street and stopping a few houses away. Moore, wearing a mask, emerged from the vehicle and started running toward her. When he arrived at her vehicle, he pressed a gun against her and instructed her to give him all her money and belongings. When a porch light came on at the group

home, Moore ordered M.K. to get into the passenger seat of her car. Moore then got into the driver's seat, ordered M.K. to start the car, and drove away with her.

**{¶ 4}** As they were driving, he ordered her to give him her jewelry. After they drove a short distance, Moore stopped the car briefly behind the black car. Chaz Bunch entered the victim's car through the rear passenger door. Bunch put a gun to her head and demanded her money.

**{¶ 5}** Moore continued driving, following the black car, which was being driven by Andre Bundy. As Moore drove, he inserted his fingers into M.K.'s vagina. M.K. pleaded for her life. At one point, Moore drove close enough to the black car that he almost hit it, jerking to a stop; at that point, the cars were so close that M.K. could make out the black car's license plate. She memorized the number.

**{¶ 6}** Eventually, Moore pulled ahead of the black car and drove down a dead-end street. The black car followed. Both cars parked near a gravel lot, and Bunch ordered M.K. out of the car. Once outside the car, Moore and Bunch assaulted M.K., grabbing her by the hair and forcing their penises into her mouth; one would orally rape her while the other forced her head down. This was repeated two or three times, at gunpoint.

**{¶ 7}** Moore and Bunch then directed M.K. to the trunk of her car. At this point, another man, Jamar Callier, exited the black car and went through M.K.'s belongings in the trunk. M.K. was told to pull her pants down and turn around. M.K. resisted, and in an attempt to avoid any further violence, told the attackers she was pregnant (she was not, in fact, pregnant). But they showed no mercy; Moore and Bunch pushed her against the car, and at least one of them anally raped her.

**{¶ 8}** After the anal rape, Bunch threw M.K. to the ground, and he and Moore proceeded to vaginally and orally rape her. While one raped her vaginally, the other would force his penis into her mouth, and they would then switch places. Both were armed during the rapes.

{¶ 9} The attack finally ended when Callier pushed Bunch off M.K. Bunch said that he wanted to kill M.K., but Callier would not let him, telling Bunch that he could not kill a pregnant woman. Moore put his gun into M.K.'s mouth and told her, "Since you were so good, I won't kill you." Moore warned her that they knew who she was; he threatened to harm her and her family if she told anyone what had happened.

{¶ 10} Hysterical, M.K. got back into her car and drove immediately to the home of a relative of her boyfriend, where she had been attending a cookout before leaving to go to work. She arrived back at the party, got out of her car, and ran through the yard, screaming for help. When people came to her aid, she immediately yelled out the license-plate number she had memorized. Based on the license-plate number, police were eventually able to arrest all four people involved in the attack on M.K.

{¶ 11} In her testimony at trial, M.K. described the effect of the attack on her life: "[T]hey killed a part of me. They killed a part of my [soul] that I can never get back."

**Moore's Convictions**

{¶ 12} After Moore was taken into custody, juvenile proceedings were initiated against him. The case was transferred to the General Division of the Mahoning County Court of Common Pleas; a 12-count complaint with 11 firearm specifications was filed against Moore on May 16, 2002, for the crimes committed against Jason Cosa, Christine Hammond, and M.K. The counts included three counts of aggravated robbery in violation of R.C. 2911.01(A)(1), three counts of rape in violation of R.C. 2907.02(A)(2), three counts of complicity to commit rape in violation of R.C. 2923.03(A)(2) and 2907.02(A)(2), one count of kidnapping in violation of R.C. 2905.01(A)(4), one count of conspiracy to commit aggravated robbery in violation of R.C. 2923.01(A)(1) and 2911.01(A)(1), and one count of aggravated menacing in violation of R.C. 2903.21(A).

**{¶ 13}** Moore, Bunch, and Bundy were tried together. The trial began on September 23, 2002. On October 2, 2002, the jury found Moore guilty of all 12 counts and all the specifications. At the October 23, 2002 sentencing hearing, the trial court concluded that Moore "[could not] be rehabilitated, that it would be a waste of time and money and common sense to even give it a try." The court announced to Moore, "I want to make sure you never get out of the penitentiary, and I'm going to make sure that you never get out of the penitentiary." It sentenced Moore to the maximum prison term for each count, to be served consecutively, except for the menacing charge, which was to be served concurrently with the other sentences. The court also sentenced Moore to a prison term for each of the 11 firearm specifications, also to be served consecutively. The sentence totaled 141 years in prison.

### Moore's Appeals

**{¶ 14}** Moore's appellate history is lengthy and knotty. We untangle it enough to establish the relevant through-line for purposes of the present appeal from the court of appeals' denial of Moore's application for reconsideration in his third direct appeal.

**{¶ 15}** In Moore's first appeal, *State v. Moore*, 161 Ohio App.3d 778, 2005-Ohio-3311, 832 N.E.2d 85 (7th Dist.) ("*Moore I*"), the appellate court vacated Moore's conviction for conspiracy to commit aggravated robbery as well as the accompanying firearm specification. *Id.* at ¶ 23. As for the other ten firearm specifications, the appellate court instructed the trial court to impose at resentencing a total of four separate terms: one for the specification attached to the charge for the aggravated robbery of Cosa and Hammond and three for the specifications attached to the charges for the aggravated robbery, rape, and kidnapping of M.K. *Id.* at ¶ 55.

**{¶ 16}** On September 7, 2005, the trial court, on remand, resentenced Moore according to the appellate court's instruction. The new sentence totaled 112 years.

Moore appealed again, and in *State v. Moore*, 7th Dist. Mahoning No. 05 MA 178, 2007-Ohio-7215 ("*Moore II*"), the appellate court vacated the entire sentence and remanded for resentencing because Moore's previous sentence had involved judicial factfinding of the kind declared unconstitutional by this court in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

{¶ 17} On February 5, 2008, the trial court resentenced Moore to the aggregate 112-year prison term. The judge told Moore at the sentencing hearing, "[I]t is the intention of this court that you should never be released from the penitentiary."

{¶ 18} Moore's appeal from that sentence is the root of the present appeal. Moore appealed his resentencing, but his court-appointed counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), seeking to withdraw from the case; *Anders* "permit[s] an attorney who, after conscientious examination of the record, concludes that a criminal appeal is wholly frivolous to so advise the court and request permission to withdraw, provided that his request is accompanied with a brief identifying anything in the record that could arguably support the client's appeal," *Disciplinary Counsel v. Milhoan*, 142 Ohio St.3d 230, 2014-Ohio-5459, 29 N.E.3d 898, ¶ 8. Moore's counsel was unable to identify any issue that could arguably support an appeal, stating that he found "this third appeal to be frivolous in the legal sense and without merit," and the court granted his motion to withdraw. *State v. Moore*, 7th Dist. Mahoning No. 08 MA 20, 2009-Ohio-1505 ("*Moore III*"). The court went on to consider the assignment of error that Moore had raised in his pro se brief—that his resentencing pursuant to *Foster* violated his due-process rights—and reviewed the entire record, concluded that Moore's appeal was meritless, and affirmed the trial court's judgment. *Moore III* at ¶ 24. The court announced its decision on March 24, 2009. It is this decision that Moore moved the court to reconsider—but he did not do so until September 16, 2013.

{¶ 19} In the meantime, Moore pursued other avenues of relief, and in that branch of his appellate history, first sought relief based on *Graham*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825. On December 30, 2009, Moore filed a petition for a writ of mandamus and/or a writ of procedendo in the Seventh District Court of Appeals, seeking to compel the trial court to issue a final, appealable judgment entry of sentence for his original 2002 convictions that would comply with Crim.R. 32(C), containing all the elements set forth by this court in *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163. On March 30, 2010, the appellate court partially granted Moore's petition, ordering the trial court to issue a revised sentencing entry that complied with Crim.R. 32(C). *State ex rel. Moore v. Krichbaum*, 7th Dist. Mahoning No. 09 MA 201, 2010-Ohio-1541 ("*Moore IV*").

{¶ 20} On April 20, 2010, the trial court issued a nunc pro tunc sentencing entry that complied with Crim.R. 32(C). On May 17, 2010, the United States Supreme Court decided *Graham*, holding that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." *Graham* at 74. That same day, Moore filed a notice of appeal from the trial court's nunc pro tunc entry; in his brief in support filed December 9, 2010, Moore raised several issues, including that pursuant to *Graham*, his 112-year sentence violated the Eighth Amendment to the United States Constitution.

{¶ 21} During the pendency of that appeal, this court held in *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, paragraph one of the syllabus, that "[a] nunc pro tunc judgment entry issued for the sole purpose of complying with Crim.R. 32(C) to correct a clerical omission in a final judgment entry is not a new final order from which a new appeal may be taken." Based on that decision, the court of appeals dismissed Moore's appeal from the nunc pro tunc entry. *State v. Moore*, 7th Dist. Mahoning No. 10-MA-85, 2011-Ohio-6220 ("*Moore V*"). Although it dismissed the appeal on the basis of *Lester*, the court briefly addressed Moore's *Graham*-centered claim, stating that it was "barred in

this case by the doctrine of res judicata" and that it was an "argument * * * more properly raised in a petition for postconviction relief." *Moore V* at ¶ 33. The court's decision was announced on November 30, 2011.

{¶ 22} On September 16, 2013, about a month after gaining new counsel, Moore filed an application for delayed reconsideration of the court of appeals' decision in *Moore III*, pursuant to App.R. 26(A)(1) and 14(B). App.R. 26(A)(1) allows a party to file an application to request the panel that issued a decision to reconsider its decision, but that application must be made no later than ten days after the clerk of the court has mailed the judgment or order to the parties. App.R. 14(B) allows for an exception to the App.R. 26(A)(1) timeline—the court may enlarge the time for filing an application for reconsideration "on a showing of extraordinary circumstances." Moore argued that the court should reconsider his appeal because his sentence was unconstitutional pursuant to *Graham* and *Miller v. Alabama*, __ U.S. __, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). In *Miller*, a case involving a juvenile who had been convicted of murder and sentenced to a mandatory term of life imprisonment without parole, the court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," reasoning that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at 2469.

{¶ 23} A divided court denied Moore's application. The majority's two-paragraph opinion cited its judgment entries denying similar applications in *State v. Bunch*, 7th Dist. Mahoning No. 06 MA 106 (Aug. 8, 2013), which involved one of Moore's codefendants, and *State v. Barnette*, 7th Dist. Mahoning No. 06 MA 135 (Sept. 16, 2013). *State v. Moore*, 7th Dist. Mahoning No. 08 MA 20, 2013-Ohio-5868, ¶ 2.

{¶ 24} In *Bunch*, the court first considered the timeliness of the application for reconsideration under App.R. 26(A)(1); the decision appealed from had been

8

announced in 2007, but Bunch's application was not filed until 2013. Since the application was untimely, the court next determined whether Bunch had shown extraordinary circumstances meriting an enlargement of the time to request reconsideration pursuant to App.R. 14(B). Ultimately, the court held that Bunch failed to show extraordinary circumstances, for two reasons.

{¶ 25} First, the court looked to the delay from the date of the *Graham* decision to the date the application for reconsideration was filed, a period of almost three years: "The almost three year delay in filing the application for reconsideration and motion to enlarge time does not lend support for a finding of extraordinary circumstances. Had the application and motion been filed more closely in time to the *Graham* decision it could support a finding of extraordinary circumstances." *Bunch* at 3.

{¶ 26} Second, and "most important," the court stated that "when appellate courts have found extraordinary circumstances based on binding decisions from higher courts, they have done so when the higher court's case is directly on point." *Id.* The court explained, "The basis for this reasoning is that appellate courts will grant reconsideration petitions when either there is an obvious error in the appellate court's decision or when it is demonstrated that the appellate court did not properly consider an issue." *Id.* If a higher court's decision is not directly on point, the court reasoned, then any error would not be obvious and would not warrant the requisite finding of extraordinary circumstances.

{¶ 27} The court in *Bunch* pointed out that both *Graham* and *Miller* concerned cases that "were based specifically on life sentences without the possibility of parole; they were not based on 'de facto' life sentences." *Id.* at 4. Thus, according to the court, although Bunch was a juvenile when he committed his crimes and his fixed-term sentence was 89 years, the fact that his sentence may be considered a "de facto" life sentence meant that his case was not directly on point with *Graham* or *Miller*. Further, the court stated that "as of yet, no Ohio

Supreme Court or United States Supreme Court decision has extended the *Graham* or *Miller* holding to 'de facto' life sentences." *Id.*

{¶ 28} The other decision the court cited in rejecting Moore's application for reconsideration, *Barnette* (another case in which the appellant sought reconsideration of a 2007 decision in 2013), contained virtually identical reasoning and language as the court's decision in *Bunch*.

{¶ 29} Moore appealed the denial of his application for reconsideration to this court. The cause is before this court upon the acceptance of a discretionary appeal. 138 Ohio St.3d 1467, 2014-Ohio-1674, 6 N.E.3d 1204. Moore raises one proposition of law: "The Eighth Amendment prohibits sentencing a juvenile to a term-of-years sentence that precludes any possibility of release during the juvenile's life expectancy."

## LAW AND ANALYSIS

### Moore's Sentence

{¶ 30} To begin, we establish the potential prison term we are addressing in this case. Moore accepts the state's interpretation of the effect of R.C. 2929.20(C)(5) on his 112-year sentence; under that interpretation, Moore would become eligible to file a motion for judicial release after serving 77 years of his sentence. R.C. 2929.20(C)(5) allows an offender to seek judicial release five years after the completion of the mandatory portions of the offender's sentence. Moore's six ten-year sentences relating to rape are mandatory, R.C. 2929.13(F), as are his four three-year sentences under the gun specifications, R.C. 2941.145. Moore would have to serve five additional years beyond the mandatory 72 years, for a total of 77 years, before becoming eligible to seek judicial release. Moore would thus be 92 years old before he would have his first chance to move a court for release. There is no dispute that his life expectancy falls well short of 92 years. A male who was 15 years of age in 2002 had a life expectancy of an additional 60.2 years; a 15-year-old black male had a life expectancy of an additional 54.9 years. U.S.

10

Department of Health and Human Services, *National Vital Statistics Reports*, Volume 52, Number 3, at 26 (2003), http://www.cdc.gov/nchs/data/nvsr/nvsr52/nvsr52_03.pdf (accessed Oct. 5, 2016). Therefore, we must consider whether a minimum 77-year sentence, i.e., a sentence that extends beyond the life expectancy of the offender, is constitutional when imposed on a 15-year-old nonhomicide offender.

### Proportionality Review

{¶ 31} The Eighth Amendment to the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." A key component of the Constitution's prohibition against cruel and unusual punishment is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). "Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment." *Montgomery v. Louisiana*, __ U.S. __, 136 S.Ct. 718, 732-733, 193 L.Ed.2d 599 (2016).

{¶ 32} There are two classifications of proportionality review—one involving the length of term-of-years sentences given in a particular case and the other involving categorical restrictions. In this case, we deal with a categorical restriction. Within that classification, there are two subsets. One subset considers the nature of the offense—for example, in *Kennedy v. Louisiana*, 554 U.S. 407, 437, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), the United States Supreme Court held that capital punishment is impermissible for defendants who commit a nonhomicide rape of a child. The second subset considers the characteristics of the offender; in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), for instance, the court ruled that the Eighth Amendment prohibits the execution of a mentally retarded defendant.

**{¶ 33}** In recent years, the United States Supreme Court has established categorical prohibitions of certain punishments for juveniles, pursuant to the Eighth Amendment. In *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the court prohibited imposition of the death penalty on defendants who committed their crimes before the age of 18; in *Graham*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825, the court prohibited the imposition of life-without-parole sentences on juvenile offenders who did not commit homicide; and in *Miller*, __ U.S. __, 132 S.Ct. 2455, 183 L.Ed.2d 407, the court prohibited the mandatory imposition of life-without-parole sentences on offenders who had committed murder as juveniles.

**{¶ 34}** Our focus in this case is *Graham*. The court did not address in *Graham* whether a term-of-years prison sentence that extends beyond an offender's life expectancy—a functional life sentence—falls under the *Graham* categorical bar. But we conclude that *Graham* does establish a categorical prohibition of such sentences.

### *Graham*

**{¶ 35}** *Graham* held that sentences of life imprisonment without parole for juvenile nonhomicide offenders were cruel and unusual in violation of the Eighth Amendment in light of three factors—the limited moral culpability of juvenile nonhomicide offenders, the inadequacy of penological theory justifying the length of life-without-parole sentences for such offenders, and the severity of life-without-parole sentences. *Graham* at 74.

**{¶ 36}** First, the court explained in *Graham* that a juvenile who did not kill or intend to kill has "twice diminished moral culpability" based on two factors: the nature of the crime and the juvenile's age. *Id.* at 69. As for the nature of the crime, the court found that "[a]lthough an offense like robbery or rape is 'a serious crime deserving serious punishment,' *Enmund* [*v. Florida*, 458 U.S. 782] 797, 102 S.Ct. 3368, [73 L.Ed.2d 1140 (1982)], those crimes differ from homicide crimes in a

12

moral sense," such that nonhomicide defendants "are categorically less deserving of the most serious forms of punishment than are murderers." *Graham* at 69.

{¶ 37} In addition, juveniles are less morally culpable than adults due to their youth and what comes with it:

> [*Roper and Graham*] relied on three significant gaps between juveniles and adults. First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569, 125 S.Ct. 1183. Second, children "are more vulnerable * * * to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.*, at 570, 125 S.Ct. 1183.

(Ellipsis sic.) *Miller*, __ U.S. __, 132 S.Ct. at 2464, 183 L.Ed.2d 407.

{¶ 38} Because of the characteristics of youth, a depraved crime committed by a juvenile may not be indicative of an irredeemable individual.

> These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." [*Roper*] at 573, 125 S.Ct. 1183. Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.*,

at 569, 125 S.Ct. 1183.  A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult."  *Thompson* [*v. Oklahoma*, 487 U.S. 815] 835, 108 S.Ct. 2687, [101 L.Ed.2d 702 (1988)] (plurality opinion).

*Graham*, 560 U.S. at 68, 130 S.Ct. 2011, 176 L.Ed.2d 825.

{¶ 39} The inherently diminished moral culpability and other characteristics of juvenile offenders means that the recognized, legitimate goals of penal sanctions—retribution, deterrence, incapacitation, and rehabilitation—do not justify the imposition of the harshest penalties on juveniles who have committed nonhomicide crimes:

*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.

Because " '[t]he heart of the retribution rationale' " relates to an offender's blameworthiness, " 'the case for retribution is not as strong with a minor as with an adult.' " *Graham*, 560 U.S., at __, 130 S.Ct., at 2028 (quoting *Tison v. Arizona*, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Roper*, 543 U.S., at 571, 125 S.Ct. 1183).  Nor can deterrence do the work in this context, because " 'the same characteristics that render juveniles less culpable than adults' "—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment.  *Graham*, 560 U.S., at __, 130 S.Ct., at 2028 (quoting *Roper*, 543 U.S., at 571, 125 S.Ct. 1183).  Similarly, incapacitation could not support the life-without-parole sentence in *Graham*:  Deciding that a "juvenile

14

offender forever will be a danger to society" would require "mak[ing] a judgment that [he] is incorrigible"—but " 'incorrigibility is inconsistent with youth.' " 560 U.S., at __, 130 S.Ct., at 2029 (quoting *Workman v. Commonwealth*, 429 S.W.2d 374, 378 (Ky.App.1968)). And for the same reason, rehabilitation could not justify that sentence. Life without parole "forswears altogether the rehabilitative ideal." *Graham*, 560 U.S., at __, 130 S.Ct., at 2030. It reflects "an irrevocable judgment about [an offender's] value and place in society," at odds with a child's capacity for change. *Ibid.*

(Brackets sic.) *Miller* at 2465.

{¶ 40} The severity of the life-without-parole penalty also formed part of the basis of the court's decision in *Graham*. *Graham* explained that life-without-parole sentences are harsher when imposed on juveniles than when they are imposed on older defendants:

Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. * * * This reality cannot be ignored.

*Graham* at 70-71.

{¶ 41} The imposition of the most severe penalties on juveniles is contrary to what the court described in *Miller*, __ U.S. __, 132 S.Ct. at 2466, 183 L.Ed.2d 407, as "*Graham*'s (and also *Roper*'s) foundational principle: that imposition of a

State's most severe penalties on juvenile offenders cannot proceed as though they were not children."

{¶ 42} The most important attribute of the juvenile offender is the potential for change. *Graham* relates the difficulty in determining whether the commission of a crime is the result of immaturity or of irredeemable corruption. And so *Graham* protects juveniles categorically from a final determination while they are still youths that they are irreparably corrupt and undeserving of a chance to reenter society. "It remains true that '[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.' " *Graham*, 560 U.S. at 68, 130 S.Ct. 2011, 176 L.Ed.2d 825, quoting *Roper*, 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1.

{¶ 43} That is why *Graham* recognizes that although an offender convicted as a juvenile can ultimately spend a lifetime in jail, the offender has to be given a chance at some point to prove himself worthy of reentering society. A sentence must not "den[y] the juvenile offender a chance to demonstrate growth and maturity. Incapacitation cannot override all other considerations, lest the Eighth Amendment's rule against disproportionate sentences be a nullity." *Id.* at 73.

{¶ 44} Still, *Graham* does not foreclose the possibility that a defendant who commits a heinous crime as a youth will indeed spend his entire remaining lifetime in prison; *Graham* does not guarantee an eventual release. "What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. *Graham* leaves it to the states to determine how to achieve that requirement: "It is for the State, in the first instance, to explore the means and mechanisms for compliance." *Id.*

{¶ 45} Again, the state retains the ability, upon a meaningful evaluation of an offender who committed a nonhomicide as a juvenile, to impose lifetime

incarceration upon the most serious offenders. "The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." *Graham*, 560 U.S. at 75, 130 S.Ct. 2011, 176 L.Ed.2d 825.

{¶ 46} The court in *Graham* did not establish a limit to how long a juvenile can remain imprisoned before getting the chance to demonstrate maturity and rehabilitation. But it is clear that the court intended more than to simply allow juveniles-turned-nonagenarians the opportunity to breathe their last breaths as free people. The intent was not to eventually allow juvenile offenders the opportunity to leave prison in order to die but to live part of their lives in society. The court stated in *Montgomery*, a case involving a defendant who had been convicted of murder as a juvenile,

> In light of what this Court has said in *Roper*, *Graham*, and *Miller* about how children are constitutionally different from adults in their level of culpability, * * * prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored.

*Montgomery*, __ U.S. __, 136 S.Ct. at 736-737, 193 L.Ed.2d 599.

{¶ 47} It does not take an entire lifetime for a juvenile offender to earn a first chance to demonstrate that he is not irredeemable. Pursuant to *Graham*, the Eighth Amendment prohibits the imposition of a sentence that denies a juvenile some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

## Applying *Graham*

### *Term-of-Years Sentences*

{¶ 48} The state argues that *Graham* applies only to juvenile offenders sentenced to life imprisonment without parole for a nonhomicide offense. Although the defendant in *Graham* was serving a life sentence, we conclude that the principles behind *Graham* apply equally to a juvenile nonhomicide offender sentenced to prison for a term of years that extends beyond the offender's life expectancy.

{¶ 49} *Graham* cited the lessened moral culpability of juvenile offenders, the severity of the sentence, and the inapplicability of penological justifications for life sentences for juveniles as reasons for declaring life sentences for juvenile nonhomicide offenders unconstitutional under the Eighth Amendment. Those same factors apply to term-of-years prison sentences that exceed a juvenile offender's expected lifespan.

{¶ 50} As in *Graham*, in this case the defendant was convicted of nonhomicide offenses that he committed as a juvenile and thus has twice-diminished moral culpability. That is the overriding element in this case. As the court stated in *Miller*, "[C]hildren are different," and " ' "[o]ur history is replete with laws and judicial recognition" that children cannot be viewed simply as miniature adults.' *J.D.B.*, 564 U.S., at __, 131 S.Ct., at 2404 (quoting *Eddings*, 455 U.S., at 115-116, 102 S.Ct. 869)." *Miller*, __ U.S. __, 132 S.Ct. at 2470, 183 L.Ed.2d 407.

{¶ 51} The protections in *Graham* flow from the defendant's juvenile status. The question we must consider is whether, under *Graham*, there is a consequential distinction between the life sentence imposed in *Graham* and the sentence imposed in this case, which extends beyond Moore's life expectancy.

{¶ 52} Did the trial court sentence Moore to life in prison? Undoubtedly, that was the aim of the sentencing court, as reflected in its statements at

sentencing—"I want to make sure you never get out of the penitentiary, and I'm going to make sure that you never get out of the penitentiary"—and at resentencing—"[I]t is the intention of this court that you should never be released from the penitentiary." The fact that Moore could survive his current sentence is not outside the realm of possibility; Moore accepts the state's interpretation of R.C. 2929.20(C)(5), under which he would become eligible to file a motion for judicial release after serving 77 years of his sentence. Still, Moore would be 92 years old, well beyond his life expectancy, before he would have his first chance to move the court for release.

{¶ 53} *Graham* discusses the fact that under a life-without-parole sentence, a juvenile offender "will on average serve more years and a greater percentage of his life in prison than an adult offender." *Graham*, 560 U.S. at 70, 130 S.Ct. 2011, 176 L.Ed.2d 825. The same mathematical reality—that a person who begins serving a life sentence as a juvenile serves a greater number of years and a greater percentage of his or her life in prison than a person who starts serving his sentence as an adult—extends to multidecade sentences that outstrip a juvenile's life expectancy. The practical reality is that juveniles sentenced to terms extending beyond their life expectancies are serving the lengthiest sentences—in terms of the number of years actually served in prison—that a state can impose.

{¶ 54} In *Sumner v. Shuman*, 483 U.S. 66, 83, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), the court compared sentences of life without parole and term-of-years sentences extending beyond an offender's life expectancy in addressing a Nevada statute that imposed a mandatory death sentence on a prisoner who committed murder in prison while serving a life-without-parole sentence. The court responded to the argument that the death penalty was a necessary deterrent to a person serving a life-without-parole sentence: "Close consideration of the deterrence argument also points up the fact that there is no basis for distinguishing, for purposes of deterrence, between an inmate serving a life sentence without possibility of parole

and a person serving several sentences of a number of years, the total of which exceeds his normal life expectancy." *Id.* The court recognized that a person serving a term-of-years sentence extending beyond his life expectancy is in as hopeless a situation as a person serving a sentence of life without parole.

{¶ 55} The court held in *Graham* that life-without-parole sentences lacked penological justification when imposed on juvenile nonhomicide offenders. If "none of the goals of penal sanctions that have been recognized as legitimate— retribution, deterrence, incapacitation, and rehabilitation * * *—provides an adequate justification" for imposing a life-without-parole sentence on a juvenile nonhomicide offender, *Graham* at 71, then a term-of-years sentence that extends beyond a juvenile nonhomicide offender's expected lifespan does not have penological justification either. As the court held in *Graham*, retribution is related to the moral culpability of the offender; retribution does not justify imposing on a person with twice-diminished moral culpability a sentence that is the most severe in terms of years served that a state can impose.

{¶ 56} Deterrence is also insufficient to justify the practice of imposing a sentence on a juvenile that extends past his life expectancy. *Graham* held that "[d]eterrence does not suffice to justify" a life sentence: "Because juveniles' 'lack of maturity and underdeveloped sense of responsibility * * * often result in impetuous and ill-considered actions and decisions,' *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), they are less likely to take a possible punishment into consideration when making decisions." (Ellipsis sic.) *Graham*, 560 U.S. at 72, 130 S.Ct. 2011, 176 L.Ed.2d 825. It is unrealistic to think that a sentence that likely extends for a lifetime could have more of a deterrent effect on a child than a life-without-parole sentence.

{¶ 57} The penological goal of incapacitation falls short as a justification for term-of-years sentences that extend beyond a juvenile's expected lifespan because of the inability to determine whether a juvenile offender is incorrigible and

necessitates being separated from society for what will probably be the remainder of the juvenile's lifetime. "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." *Id.* at 72-73.

{¶ 58} Finally, as far as rehabilitation is concerned, like a life-without-parole sentence, a term-of-years sentence that extends beyond a juvenile's life expectancy "forswears altogether the rehabilitative ideal. By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society. This judgment is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." *Id.* at 74.

{¶ 59} The sentence imposed on Moore is functionally a life sentence. We see no significant difference between a sentence of life imprisonment without parole and a term-of-years prison sentence that would extend beyond the defendant's expected lifespan before the possibility of parole. The court in *Graham* was not barring a terminology—"life without parole"—but rather a punishment that removes a juvenile from society without a meaningful chance to demonstrate rehabilitation and obtain release. The state may not impose at the outset its harshest sentences on a person with twice-diminished moral culpability.

{¶ 60} It makes little sense that a juvenile offender sentenced to prison for life without parole would get a chance, pursuant to *Graham*, to prove his or her rehabilitation and be released but a juvenile offender sentenced to a functional life term would not. Could a court that imposed an unconstitutional life-without-parole sentence on a juvenile offender correct Eighth Amendment deficiencies upon remand by resentencing the defendant to a term-of-years sentence when parole would be unavailable until after the natural life expectancy of the defendant? Certainly not.

**{¶ 61}** Further, the United States Supreme Court has all but abolished life-without-parole sentences even for those juveniles who commit homicide:

> *Miller* did not go so far as to bar courts from imposing the sentence of life without the possibility of parole on a juvenile. Yet because of the severity of that penalty, and because youth and its attendant circumstances are strong mitigating factors, that sentence should rarely be imposed on juveniles.

*State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 29, citing *Miller*, __ U.S. __, 132 S.Ct. at 2469, 183 L.Ed.2d 407. As the court recognized in *Montgomery*, "Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole. After *Miller*, it will be the rare juvenile offender who can receive that same sentence." *Montgomery*, __ U.S. __, 136 S.Ct. at 734, 193 L.Ed.2d 599. *Graham* cannot stand for the proposition that juveniles who do not commit homicide must serve longer terms in prison than the vast majority of juveniles who commit murder, who, because of *Miller*, are all but assured the opportunity to demonstrate maturity and rehabilitation at a meaningful point in their sentences.

**{¶ 62}** Under his current sentence, Moore would probably die in prison. If he did survive the 77 years that he is required to serve, his period of incarceration likely would be among the longest ever served in Ohio. That would be the case despite the fact that he did not commit the ultimate crime of murder and was not fully formed when he committed his nonhomicide crimes. The "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Miller* at 2466. Because Moore was a child when he committed his crimes, he must be treated differently, pursuant to *Graham*. The key principle in *Graham* is that the commission of a nonhomicide offense in childhood should

22

not preclude the offender from the opportunity to someday demonstrate that he is worthy to reenter society: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." *Graham*, 50 U.S. at 82, 130 S.Ct. 2011, 176 L.Ed.2d 825.

{¶ 63} It is consistent with *Graham* to conclude that a term-of-years prison sentence extending beyond a juvenile defendant's life expectancy does not provide a realistic opportunity to obtain release before the end of the term. *Graham* decried the fact that the defendant in that case would have no opportunity to obtain release "even if he spends the next half century attempting to atone for his crimes and learn from his mistakes." *Id.* at 79. Certainly, the court envisioned that any nonhomicide juvenile offender would gain an opportunity to obtain release sooner than after three quarters of a century in prison. *Graham* is less concerned about how many years an offender serves in the long term than it is about the offender having an opportunity to seek release while it is still meaningful.

{¶ 64} We determine that pursuant to *Graham*, a sentence that results in a juvenile defendant serving 77 years before a court could for the first time consider based on demonstrated maturity and rehabilitation whether that defendant could obtain release does not provide the defendant a meaningful opportunity to reenter society and is therefore unconstitutional under the Eighth Amendment.

*Multiple Offenses*

{¶ 65} The state also argues that *Graham* does not extend to juveniles sentenced to lengthy prison terms consisting of multiple, consecutive fixed-term sentences for nonhomicide offenses. The state argues that in *Graham*, the court simply held that the Eighth Amendment forbids the sentence of life imprisonment

without parole for juvenile offenders who commit a *single* nonhomicide offense. We reject that argument.

{¶ 66} We note at the outset that the defendant in *Graham* had committed multiple offenses. When Graham was 16 years old, he and an accomplice entered a restaurant at closing time with the intent to rob it; the accomplice hit the restaurant manager in the back of the head with a metal bar, causing a head injury that required stitches. Graham was charged as an adult with armed burglary with assault or battery, a first-degree felony carrying a maximum penalty of life imprisonment without the possibility of parole, and attempted armed robbery, a second-degree felony carrying a maximum penalty of 15 years' imprisonment. He pleaded guilty to both charges under a plea agreement. The trial court withheld adjudication of guilt and sentenced Graham to three years' probation, the first year of which had to be spent in the county jail. *Graham*, 560 U.S. at 53-54, 130 S.Ct. 2011, 176 L.Ed.2d 825.

{¶ 67} Less than six months after his release from jail, Graham was involved in an armed home-invasion robbery. Later that same evening, he and his accomplices attempted another home invasion, and an accomplice was shot. Graham later admitted to police that he had been involved in two or three other robberies before that night. *Id.* at 54-55.

{¶ 68} The trial court found that Graham had violated his probation by committing a home-invasion robbery, by possessing a firearm, and by associating with persons engaged in criminal activity. *Id.* at 55. Citing an "escalating pattern of criminal conduct" and a desire to protect the community, the trial court sentenced Graham to the maximum sentence on each of the two original charges—life on the first charge and 15 years on the second. *Id.* at 57.

{¶ 69} The Supreme Court in *Graham* acknowledged that Graham committed serious crimes early on in his period of supervised release, "posed an immediate risk," and deserved to be separated from society "in order to prevent

24

what the trial court described as an 'escalating pattern of criminal conduct.' " *Id.* at 73. In full recognition of the multiple crimes that Graham committed, the court concluded, however, that "it does not follow that he would be a risk to society for the rest of his life." *Id.* The nature or number of the crimes he committed was less important than who he was at the time he committed them: a juvenile whose age, coupled with his commission of nonhomicide crimes, left him with "limited moral culpability" such that he could not be condemned at the outset to a lifetime of imprisonment without any hope for release. *Id.* at 74.

{¶ 70} The court created "a clear line * * * necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment." *Id.* *Graham* enunciated "a categorical rule [that] gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform." *Id.* at 79. It did not limit that holding to juveniles who were sentenced for only one offense.

{¶ 71} Instead, the protections in *Graham* apply to juveniles who do not commit homicide. Moore fits that description. The court specifically rejected a case-by-case approach that would have required courts "to take the offender's age into consideration as part of a case-specific gross disproportionality inquiry, weighing it against the seriousness of the crime." *Id.* at 77. The court admitted that "[t]his approach would allow courts to account for factual differences between cases and to impose life without parole sentences for particularly heinous crimes." *Id.*

{¶ 72} In adopting a categorical approach, the court specifically rejected proportionality review on a case-by-case basis because "it does not follow that courts taking a case-by-case proportionality approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change." *Id.* The court in *Roper* had held that simply considering youth as a mitigating factor was insufficient because of an

"unacceptable likelihood * * * that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." *Roper*, 543 U.S. at 573, 125 S.Ct. 1183, 161 L.Ed.2d 1. The *Graham* court instructed that the same is the case with life-without-parole sentences: "Here, as with the death penalty, '[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive' a sentence of life without parole for a nonhomicide crime 'despite insufficient culpability.' " *Graham*, 560 U.S. at 78, 130 S.Ct. 2011, 176 L.Ed.2d 825, quoting *Roper* at 572-573.

{¶ 73} "[N]one of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." *Miller*, __ U.S. __, 132 S.Ct. at 2465, 183 L.Ed.2d 407. Whether the sentence is the product of a discrete offense or multiple offenses, the fact remains that it was a *juvenile* who committed the one offense or several offenses and who has diminished moral culpability. To suggest that a life-without-parole sentence would be permissible for a juvenile who committed multiple offenses would be to ignore the categorical restriction against that penalty for juveniles who do not commit homicide. A court cannot impose a sentence that is barred because of the identity of the offender on the ground that the offender committed multiple crimes. As an adult offender who commits multiple, nonhomicide offenses cannot become eligible for the death penalty, neither can a juvenile offender become eligible for the most severe penalty permissible for juveniles by committing multiple nonhomicide offenses. The number of offenses committed cannot overshadow the fact that it is a child who has committed them.

**{¶ 74}** We conclude that the Eighth Amendment prohibition of life imprisonment without parole or its practical equivalent for juvenile offenders is not limited to juveniles who commit a *single* nonhomicide offense.

*Consistency with Other States*

**{¶ 75}** Our holding is consistent with those of other high courts that have held that for purposes of applying the Eighth Amendment protections set forth in *Graham* and *Miller*, there is no meaningful distinction between sentences of life imprisonment without parole and prison sentences that extend beyond a juvenile's life expectancy.

**{¶ 76}** In *People v. Caballero*, 55 Cal.4th 262, 268-269, 145 Cal.Rptr. 286, 282 P.3d 291 (2012), the California Supreme Court held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." The defendant in that case had been convicted of multiple counts of attempted murder and would become eligible for parole only after serving 110 years. The court stated that "*Graham*'s analysis does not focus on the precise sentence meted out. Instead, * * * it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." *Caballero* at 268, quoting *Graham*, 560 U.S. at 82, 130 S.Ct. 1183, 176 L.Ed.2d 825.

**{¶ 77}** In *Henry v. State*, 175 So.3d 675 (Fla.2015), the Florida Supreme Court declared unconstitutional a term-of-years sentence imposed on a nonhomicide offender. The defendant in *Henry* had been sentenced to an aggregate sentence of 90 years, with mandatory prison time until he reached age 95. The court declared that sentence unconstitutional pursuant to *Graham*. The court pointed out that the specific term or terminology of the sentence is not determinative as to whether the sentence violates the Eighth Amendment:

Thus, we believe that the *Graham* Court had no intention of limiting its new categorical rule to sentences denominated under the exclusive term of "life in prison." Instead, we have determined that *Graham* applies to ensure that juvenile nonhomicide offenders will not be sentenced to terms of imprisonment without affording them a meaningful opportunity for early release based on a demonstration of maturity and rehabilitation.

*Henry* at 679-680, citing *Graham* at 75.

**{¶ 78}** *Henry* held that the Constitution requires a mechanism for review of lengthy sentences given to juvenile offenders:

In light of *Graham*, and other Supreme Court precedent, we conclude that the Eighth Amendment will not tolerate prison sentences that lack a review mechanism for evaluating this special class of offenders for demonstrable maturity and reform in the future because any term of imprisonment for a juvenile is qualitatively different than a comparable period of incarceration is for an adult.

*Henry* at 680.

**{¶ 79}** In *State ex rel. Morgan v. State*, __ So.3d __, 2016 WL 6125428 (La.2016), the Supreme Court of Louisiana addressed a sentence of "99 years [of] imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence" imposed on a defendant who had committed armed robbery at age 17. *Id.* at *1. The court held that "the categorical rule in *Graham* applies to the defendant's 99-year sentence without parole insofar as it is the functional

equivalent of a life sentence and denies him a meaningful opportunity for release, to which he is entitled." *Id*. at *8.

{¶ 80} The Iowa Supreme Court in *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013), and *State v. Null*, 836 N.W.2d 41 (Iowa 2013), held that the constitutional infirmities of life-without-parole sentences for juveniles could not be overcome simply by imposing lengthy term-of-years sentences. *Ragland* dealt with a murder defendant who was sentenced to 60 years in prison; the defendant was 18 years old at the time of his imprisonment, and the sentence took him to the edge of his life expectancy. *Ragland* at 119. The court in *Ragland*, noting that "it is important that the spirit of the law not be lost in the application of the law," wrote:

> The spirit of the constitutional mandates of *Miller* and *Graham* instruct that much more is at stake in the sentencing of juveniles than merely making sure that parole is possible. In light of our increased understanding of the decision making of youths, the sentencing process must be tailored to account in a meaningful way for the attributes of juveniles that are distinct from adult conduct. At the core of all of this also lies the profound sense of what a person loses by beginning to serve a lifetime of incarceration as a youth.

*Ragland* at 121. *Ragland* held that *Miller*'s requirement of individualized sentencing consideration for youths facing life-without-parole sentences also "applies to sentences that are the functional equivalent of life without parole." *Ragland* at 121-122.

{¶ 81} In *Null*, another murder case, the court addressed the defendant's minimum sentence of 52.5 years. The court stated that "[e]ven if lesser sentences than life without parole might be less problematic, we do not regard the juvenile's potential future release in his or her late sixties after a half century of incarceration

sufficient to escape the rationales of *Graham* or *Miller*." *Null* at 71. The court recognized that the likelihood of simply surviving a sentence does not provide the protection to juvenile offenders envisioned by *Graham*: "The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*, 560 U.S. at __, 130 S.Ct. at 2030, 176 L.Ed.2d at 845-46." *Null* at 71.

{¶ 82} Moreover, *Null* made clear that courts should not undertake fine line-drawing to determine how close to the mark a sentencing court can come to a defendant's life expectancy: "[W]e do not believe the determination of whether the principles of *Miller* or *Graham* apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates." *Null* at 71. The important factor, instead, is the recognition that children have lessened moral culpability and are redeemable and so must be given a chance to demonstrate the change they have undergone since committing their crimes:

> In coming to this conclusion, we note the repeated emphasis of the Supreme Court in *Roper*, *Graham*, and *Miller* of the lessened culpability of juvenile offenders, how difficult it is to determine which juvenile offender is one of the very few that is irredeemable, and the importance of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at __, 130 S.Ct. at 2030, 176 L.Ed.2d at 845-46. We also note that in the flurry of legislative action that has taken place in the wake of *Graham* and *Miller*, many of the new statutes have allowed parole eligibility for juveniles sentenced to long prison terms for homicides to begin after fifteen or twenty-five years of incarceration.

*Null* at 71-72.

{¶ 83} Similarly, the Wyoming Supreme Court has held that "a lengthy aggregate sentence for closely-related crimes whose practical effect is that the juvenile offender will spend his lifetime in prison triggers the Eighth Amendment protections set forth by the United States Supreme Court in *Miller.*" *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132, ¶ 32 (2014). The defendant in *Bear Cloud* had been convicted of murder and aggravated burglary and sentenced to a term of 45 years. The court concluded,

> The United States Supreme Court's Eighth Amendment jurisprudence requires that a process be followed before we make the judgment that juvenile "offenders never will be fit to reenter society." *Graham*, 560 U.S. at 75, 130 S.Ct. at 2030. That process must be applied to the entire sentencing package, when the sentence is life without parole, or when aggregate sentences result in the functional equivalent of life without parole.

*Bear Cloud* at ¶ 37.

{¶ 84} In *Casiano v. Commr. of Corr.*, 317 Conn. 52, 115 A.3d 1031 (2015), the Supreme Court of Connecticut held that the defendant's 50-year sentence fell within *Miller*'s mandate of individualized sentencing for juvenile homicide offenders:

> A juvenile offender is typically put behind bars before he has had the chance to exercise the rights and responsibilities of adulthood, such as establishing a career, marrying, raising a family, or voting. Even assuming the juvenile offender does live to be

released, after a half century of incarceration, he will have irreparably lost the opportunity to engage meaningfully in many of these activities and will be left with seriously diminished prospects for his quality of life for the few years he has left. A juvenile offender's release when he is in his late sixties comes at an age when the law presumes that he no longer has productive employment prospects. * * *

The United States Supreme Court viewed the concept of "life" in *Miller* and *Graham* more broadly than biological survival; it implicitly endorsed the notion that an individual is effectively incarcerated for "life" if he will have no opportunity to truly reenter society or have any meaningful life outside of prison.

*Casiano* at 78. Thus, the court held that the imposition of a 50-year sentence—like the life-without parole sentence in *Miller*—required the trial court to "engage in an individualized sentencing process that accounts for the mitigating circumstances of youth and its attendant characteristics." *Casiano* at 59.

{¶ 85} In *People v. Reyes*, 2016 IL 119271, 68 N.E.3d 884, the defendant was sentenced to a 97-year prison term for the first-degree murder and two attempted murders he committed when he was 16 years old; he was required to serve at least 89 years of his sentence. *Id.* at ¶ 2. The Supreme Court of Illinois held that the mandatory, functional equivalent of a life sentence was unconstitutional pursuant to *Miller*:

A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison.

> *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation. * * * Accordingly, we hold that sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment.

*Reyes* at ¶ 9.

{¶ 86} We agree with these other state high courts that have held that for purposes of applying the Eighth Amendment protections discussed in *Graham* and *Miller*, there is no distinction between life-without-parole sentences for juveniles and term-of-years sentences that leave a juvenile offender without a meaningful opportunity to demonstrate rehabilitation and growth leading to possible early release within the juvenile offender's expected lifespan.

{¶ 87} We note also that most of these cases from other state supreme courts involved juveniles who had been convicted of multiple offenses. The defendants in both *Caballero* and *Henry* were sentenced for committing multiple offenses, and both courts held that the functional life sentences imposed on them violated the Eighth Amendment pursuant to *Graham*. Caballero had been convicted of three counts of attempted murder, *Caballero*, 55 Cal.4th at 265, 145 Cal.Rptr. 286, 282 P.3d 291, and *Henry* had been convicted of three counts of sexual battery with a deadly weapon or physical force, one count of kidnapping with intent to commit a felony (with a firearm), two counts of robbery, one count of carjacking, one count of burglary of a dwelling, and one count of possession of 20 grams or less of cannabis, *Henry v. State*, 82 So.3d 1084, 1085 (Fla.App.2012). Likewise, in *Bear Cloud*, *Null*, *Casiano*, and *Reyes*, the courts held that the protections of *Miller* applied in cases in which the defendants had been convicted of murder and of other

offenses; Bear Cloud was sentenced for first-degree murder, aggravated burglary, and conspiracy to commit aggravated burglary, *Bear Cloud*, 2014 WY 113, 334 P.3d 132, at ¶ 1, Null was sentenced for second-degree murder and first-degree robbery, *Null*, 836 N.W.2d at 45, Casiano was convicted of felony murder, attempted robbery, and conspiracy to commit robbery, *Casiano*, 317 Conn. at 55, 115 A.3d 1031, and Reyes was sentenced for first-degree murder and two counts of attempted murder, *Reyes*, 2016 IL 119271, 63 N.E.3d 884, at ¶ 2.

## Procedure

{¶ 88} *Graham*'s prohibition on sentences of life imprisonment without parole for juvenile nonhomicide offenders also applies to prison sentences that are the functional equivalent of life sentences. But is Moore procedurally able to gain the protection of the Eighth Amendment at this stage of his proceedings? He asks this court to overturn the court of appeals' refusal to grant reconsideration of its March 24, 2009 decision affirming his 112-year sentence. *Graham* was decided on May 17, 2010. Moore filed his application for reconsideration on September 16, 2013.

{¶ 89} App.R. 26(A)(1) allows parties ten days to move an appellate court for reconsideration of a decision: "Application for reconsideration of any cause or motion submitted on appeal shall be made in writing no later than ten days after the clerk has both mailed to the parties the judgment or order in question and made a note on the docket of the mailing as required by App.R. 30(A)." But under App.R. 14(B), the appellate court may expand or contract any time period set forth in the appellate rules, and the rule specifically allows a court to extend the time period for seeking reconsideration "on a showing of extraordinary circumstances." App.R. 14(B) reads:

> For good cause shown, the court, upon motion, may enlarge
> or reduce the time prescribed by these rules or by its order for doing

any act, or may permit an act to be done after the expiration of the prescribed time. * * * Enlargement of time to file an application for reconsideration or for en banc consideration pursuant to App.R. 26(A) shall not be granted except on a showing of extraordinary circumstances.

{¶ 90} Thus, the court below had the authority to grant Moore an extension of time to file his application for reconsideration if he showed "extraordinary circumstances." Ohio appellate courts have granted applications for delayed reconsideration well over a year after the issuance of the original decision, citing subsequent decisions of this court as providing the required extraordinary circumstances. *See, e.g.*, *State v. Finley*, 1st Dist. Hamilton No. C-061052, 2010-Ohio-5203, ¶ 6 (reconsideration granted over two years after original decision); *State v. Gandy*, 1st Dist. Hamilton No. C-070152, 2010-Ohio-2873, ¶ 8 (reconsideration granted 20 months after original decision); *Lyttle v. Ohio*, 12th Dist. Butler No. CA2010-04-089, 2012-Ohio-3042, 2012 WL 2520466, *1 (reconsideration granted over 18 months after original decision).

{¶ 91} The court below denied Moore's application for reconsideration based on its earlier decisions in *Bunch*, 7th Dist. Mahoning No. 06 MA 106, and *Barnette*, 7th Dist. Mahoning No. 06 MA 135. The court cited identical reasons for denying applications for reconsideration in *Bunch* and *Barnette*; both cases are inapplicable here.

{¶ 92} First, the court in *Bunch* and *Barnette* relied in part on the three-year lag time in both cases between the announcement of *Graham* and the filing of the application for reconsideration in state court. In *Bunch*, the court noted that Bunch had promptly raised *Graham* in his federal appeals but not in Ohio courts. The court wrote, "Had the application and motion been filed more closely in time to the

*Graham* decision it could support a finding of extraordinary circumstances." *Bunch* at 3.

{¶ 93} Moore, on the other hand, first attempted to raise *Graham* in Ohio courts on the same day *Graham* was decided. He filed a notice of appeal from the trial court's April 20, 2010 nunc pro tunc sentencing entry on May 17, 2010, the same day *Graham* was announced; in his merit brief—filed in December 2010 after he had procured appointed counsel—he raised the issue that *Graham* prohibited his lengthy sentence. That appeal was not dismissed until November 2011. Despite the fact that the court dismissed the appeal for lack of a final, appealable order, the court added in dicta that Moore's *Graham*-based argument was "barred in this case by the doctrine of res judicata" and "is one more properly raised in a petition for postconviction relief." *Moore V*, 7th Dist. Mahoning No. 10-MA-85, 2011-Ohio-6220, at ¶ 33.

{¶ 94} So, unlike the appellants in *Bunch* and *Barnette*, Moore did attempt to raise *Graham* in state court contemporaneously with its release but was discouraged from pursuing relief on that basis in dicta by the court of appeals. Once Moore obtained new counsel, however, in September 2013, he filed an application for reconsideration raising *Graham* just over a month later.

{¶ 95} Even so, the delay in filing was the less significant reason cited by the court for rejecting the applications for reconsideration in *Bunch* and *Barnette*. The court in both cases wrote that the more important reason was that "when appellate courts have found extraordinary circumstances based on binding decisions from higher courts, they have done so when the higher court's case is directly on point," *Bunch* at 3, citing *State v. Lawson*, 2013-Ohio-803, 984 N.E.2d 1126, ¶ 6 (10th Dist.), *State v. Truitt*, 1st Dist. Hamilton No. C-050188, 2011-Ohio-1885, ¶ 3, and *State v. Thomas*, 1st Dist. Hamilton No. C-010724, 2009-Ohio-971, ¶ 5; *Barnette* at 3 (same). The court reasoned that because *Graham* and *Miller* were not directly on point, those cases did not demonstrate any obvious error in the

appellate court's decision and, therefore, that the requisite finding of extraordinary circumstances warranting the enlargement of the time for filing an application for reconsideration was missing.

{¶ 96} For the reasons discussed above, we have established that Moore's case is controlled by *Graham* and that there is no meaningful distinction between the two cases. A defendant convicted of crimes he committed as a juvenile cannot at the outset be sentenced to a lifetime in prison—whether labeled "life in prison without parole" or consisting of a term of years extending beyond the defendant's life expectancy—without having a meaningful opportunity to establish maturity and rehabilitation justifying release.

{¶ 97} Generally, a new decision does not apply to convictions that were final when the decision was announced. But "courts must give retroactive effect to new substantive rules of constitutional law. Substantive rules include * * * 'rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.' " *Montgomery*, __ U.S. __, 136 S.Ct. at 728, 193 L.Ed.2d 599, quoting *Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *Graham* prohibits life-without-parole sentences or their equivalents for juveniles.

{¶ 98} In *Montgomery*, the court held that "when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral-review courts to give retroactive effect to that rule." *Id.* at 729. Specifically, *Montgomery* involved the application of the court's decision in *Miller* prohibiting the automatic imposition of a life-without-parole sentence on a defendant who had committed a homicide as a juvenile. The court found that "*Miller* announced a substantive rule of constitutional law." *Montgomery* at 734. In doing so, it recognized that "*Miller* is no less substantive than are *Roper* and *Graham*." *Montgomery* at 734.

**{¶ 99}** This court has applied an abuse-of-discretion standard in reviewing an appellate court's decision regarding an application for reconsideration. *Reichert v. Ingersoll*, 18 Ohio St.3d 220, 224, 480 N.E.2d 802 (1985). In this case, we hold that the court of appeals abused its discretion in not granting Moore's application for reconsideration concerning his unconstitutional sentence. Extraordinary circumstances warranted the request for delayed reconsideration—the on-point, substantive, retroactive United States Supreme Court decision in *Graham*.

## CONCLUSION

**{¶ 100}** We hold in this case that *Graham*'s categorical prohibition of sentences of life imprisonment without the possibility of parole for juveniles who commit nonhomicide crimes applies to juvenile nonhomicide offenders who are sentenced to term-of-years sentences that exceed their life expectancies. The court of appeals abused its discretion in failing to grant Moore's application for reconsideration. The 112-year sentence the trial court imposed on Moore violates the Eighth Amendment's prohibition against cruel and unusual punishments. We reverse the judgment of the court of appeals and vacate Moore's sentence, and we remand the cause to the trial court for resentencing in conformity with *Graham*.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and LANZINGER and O'NEILL, JJ., concur.

O'CONNOR, C.J., concurs, with an opinion.

LANZINGER, J., concurs, with an opinion.

KENNEDY, J., dissents, with an opinion joined by O'DONNELL, J.

FRENCH, J., dissents, with an opinion.

_____

**O'CONNOR, C.J., concurring.**

**{¶ 101}** I fully concur in the majority opinion's holding that *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), prohibits the

imposition, in nonhomicide cases, of a sentence that exceeds a juvenile offender's life expectancy. I write separately to address the dissenting justices' suggestion that this cause is not properly before us and to explain why this appeal satisfies the extraordinary-circumstances standard for granting an application for delayed reconsideration.

## ANALYSIS

**{¶ 102}** The first dissenting opinion would hold on both procedural and substantive grounds that the appeal is meritless. The second dissenting opinion also suggests that the cause is not properly before us but does not reach the merits of the claims raised by appellant, Brandon Moore, even though the propriety of the procedural analysis turns largely on the substantive analysis of whether extraordinary circumstances warrant allowing an application for delayed reconsideration. However framed, both dissenting opinions ultimately assert that the Seventh District Court of Appeals in this case did not abuse its discretion in denying Moore's application because, at the time of that decision, there purportedly was ample authority for the notion that *Graham* did not apply to lengthy term-of-years sentences. But the authority on which the dissenting justices rely is less compelling than the dissenting justices suggest.

### *The standard for granting an application for delayed reconsideration*

**{¶ 103}** " 'App.R. 26 provides a mechanism by which a party may prevent miscarriages of justice that could arise when an appellate court makes an obvious error or renders an unsupportable decision under the law.' " *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 10th Dist. No. 03AP-269, 2004-Ohio-2715, ¶ 2, quoting *State v. Owens*, 112 Ohio App.3d 334, 336, 678 N.E.2d 956 (11th Dist.1996).

**{¶ 104}** The plain language of App.R. 14(B) permits a court to enlarge the time to reconsider a judgment under App.R. 26(A)(1) upon a showing of extraordinary circumstances. Although the extraordinary-circumstances standard

is a limited one, Ohio courts have recognized those circumstances in three categories of cases.

{¶ 105} In the first category, the Seventh District has held that omissions in records can constitute an extraordinary circumstance warranting delayed reconsideration. *See, e.g.*, *Deutsche Bank Natl. Trust Co. v. Knox*, 7th Dist. No. 09-BE-4, 2011-Ohio-421, ¶ 9. *Accord Reichert v. Ingersoll*, 18 Ohio St.3d 220, 222-223, 480 N.E.2d 802 (1985). Because this category of cases does not encompass the present case, it is not discussed in this opinion.

{¶ 106} The second category of cases features the announcement of a new rule of law that applies directly to a pending appeal, which is the basis for the majority's conclusion that the cause is properly before us. I agree that Ohio appellate courts routinely recognize that extraordinary circumstances exist when this court issues an opinion that is directly on point with the issue raised on appeal. *See, e.g.*, *State v. Lawson*, 2013-Ohio-803, 984 N.E.2d 1126, ¶ 6 (10th Dist.); *Lyttle v. Ohio*, 12th Dist. Butler No. CA2010-04-089, 2012-Ohio-3042, ¶ 5; *State v. Cedeno*, 192 Ohio App.3d 738, 743, 950 N.E.2d 582 (1st Dist.2011); *State v. Truitt*, 1st Dist. Hamilton No. C-050188, 2011-Ohio-1885, ¶ 3.

{¶ 107} The third category of cases in which an application for delayed reconsideration may be granted consists of cases in which the question presented in the application raises an issue of sufficient importance to warrant entertaining it beyond the ten-day limit. *See, e.g.*, *Carroll v. Feiel*, 1 Ohio App.3d 145, 145-146, 439 N.E.2d 962 (8th Dist.1981). Notably, the Seventh District, the appellate court that denied Moore's application, has recognized that this rule exists. *State v. Boone*, 114 Ohio App.3d 275, 277, 683 N.E.2d 67 (7th Dist.1996).

**Graham *is a decision of sufficient importance to warrant granting Moore's application for delayed reconsideration of his lengthy term-of-years sentence***

{¶ 108} In this case, Moore received a 112-year aggregate sentence for nonhomicide offenses that he committed when he was 15 years old. At sentencing,

Judge Krichbaum opined that Moore could not be rehabilitated and baldly informed Moore of the court's intention to ensure that Moore would never be released from confinement.

{¶ 109} Notwithstanding Moore's significant crimes, such a penalty is exactly what a majority of the United States Supreme Court agreed was unconstitutional in *Graham.* But despite the significance of the *Graham* claim raised by Moore, the court of appeals summarily dispensed with it:

> We are unpersuaded by Moore's arguments. For the reasons articulated in *State v. Bunch*, 7th Dist. No. 06 MA 106, J.E. August 8, 2013 and *State v. Barnette*, 7th Dist. No. 06 MA 135, September 16, 2013, Appellant Brandon Moore's Delayed Application for Reconsideration is denied.

2013-Ohio-5868, ¶ 2.

{¶ 110} Consideration of youth in sentencing is no longer a subject of political or jurisprudential debate; the high court has decided *Miller v. Alabama*, __ U.S. __, 132 S.Ct. 2455, 2468, 183 L.Ed.2d 407 (2012), *Graham*, and *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and we may not ignore those commands any more than the court of appeals or Judge Krichbaum may do so.

{¶ 111} The gravity of the Supreme Court's decision in *Graham* is apparent from its holding that the Eighth Amendment categorically bars a sentence of life without parole for juvenile nonhomicide offenders. *Graham*, 560 U.S. at 82, 130 S.Ct. 2011, 176 L.Ed.2d 825. The court not only compared life-without-parole sentences for juveniles to the death penalty, *id.* at 69; *see also Miller* at 2463, but also noted that life-without-parole sentences are "irrevocable," *Graham* at 69. As the court explained, a sentence of life without parole

deprives the convict of the most basic liberties without giving hope
of restoration, except perhaps by executive clemency—the remote
possibility of which does not mitigate the harshness of the
sentence * * *. [T]his sentence "means denial of hope; it means that
good behavior and character improvement are immaterial; it means
that whatever the future might hold in store for the mind and spirit
of [the convict], he will remain in prison for the rest of his days."

(Second brackets sic.) *Id.* at 69-70, quoting *Naovarath v. State*, 105 Nev. 525, 526,
779 P.2d 944 (1989).

{¶ 112} Judges must treat juveniles differently, no matter how horrific their
crimes may be. And different treatment of juveniles in nonhomicide cases requires
"some meaningful opportunity" to reenter society, *id.* at 75. The trial court's
sentence in this case is irreconcilable with *Graham*, and the court of appeals'
summary denial of Moore's application for delayed reconsideration is
irreconcilable with the extraordinary-circumstances standard applicable to App.R.
26(A). As Judge DeGenaro stated in her dissent from the court of appeals' refusal
to consider Moore's claim on its merits:

Because Moore has no other avenue to make this argument,
Moore's delayed application for reconsideration should be granted.
App.R. 14(B) provides delayed reconsideration "pursuant to App.R.
26(A) shall not be granted except on a showing of *extraordinary
circumstances.*" That showing has been made here; namely, a
United States Supreme Court retroactive holding involving a
criminal constitutional issue. We would be considering an arguably
valid extension of a constitutional argument which was not available

42

to Moore when his case was before the trial court, this Court and the Ohio Supreme Court in either his direct or second appeal. Significantly, the day *Graham* was announced, Moore filed his pro-se notice of appeal in [*State v. Moore*, 7th Dist. No. 10-MA-85, 2011-Ohio-6220], arguing that his sentence was unconstitutional pursuant to *Graham*; however the panel refused to address that argument, suggesting in dicta the issue was barred by res judicata and could be raised via post-conviction proceedings.

(Emphasis sic.)  2013-Ohio-5868, at ¶ 3 (DeGenaro, J., dissenting).

**{¶ 113}** Even assuming arguendo that "[r]elief under App.R. 14(B) is subject to the court of appeals' discretion," dissenting opinion, French, J., at 3, citing *L.R. Patrick, Inc. v. Karlsberger & Assocs., Architects, Inc.*, 10th Dist. Franklin No. 81AP-70, 1981 WL 3231, *1 (June 4, 1981), we are not compelled to rubber-stamp the ruling of the court of appeals.  And as explained below, the authorities cited by the dissenting justices do not undermine the majority's conclusion that the appellate court abused its discretion in refusing to grant Moore's application for delayed reconsideration.

**{¶ 114}** Before proceeding, I note my agreement with the dissenting justices that "abuse of discretion" in a criminal case means more than an error of law or judgment and implies that the lower court's attitude was unreasonable, arbitrary, or unconscionable.  *See State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980), citing *Steiner v. Custer*, 137 Ohio St. 448, 31 N.E.2d 855 (1940); *see also Steiner* at 451 (an abuse of discretion is " 'a view or action "that no conscientious judge, acting intelligently, could honestly have taken" ' "), quoting *Long v. George*, 296 Mass. 574, 579, 7 N.E.2d 149 (1937), quoting *Davis v. Boston Elevated Ry. Co.*, 235 Mass. 482, 502, 126 N.E. 841 (1920).  But "discretion" " 'means the equitable decision of what is just and proper under the

circumstances,' " including the rights and interests of all parties, justice, and equity. *Long* at 578, quoting *Paquette v. Fall River*, 278 Mass. 172, 174, 179 N.E. 588 (1932), quoting *The Styria v. Morgan*, 186 U.S. 1, 9, 22 S.Ct. 731, 46 L.Ed. 1207 (1902). And "[j]udicial discretion must be carefully—and cautiously—exercised before this court will uphold an outright dismissal of a case on purely procedural grounds." *Reichert*, 18 Ohio St.3d at 222, 480 N.E.2d 802.

***The dissents' reliance on federal habeas law is improper***

{¶ 115} Both dissents rely upon federal habeas decisions governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. 2254(d). Dissenting opinion of French, J., at 6-7, citing *Bunch v. Smith*, 685 F.3d 546, 550 (6th Cir.2012) (*Graham* did not "clearly establish" that consecutive, fixed-term sentences for juveniles are unconstitutional when they amount to "the practical equivalent of life without parole"), and *Goins v. Smith*, N.D.Ohio No. 4:09-CV-1551, 2012 WL 3023306, *6 (July 24, 2012), *aff'd*, 556 Fed.Appx. 434 (6th Cir.2014); dissenting opinion of Kennedy, J., at 6-8, citing *Bunch v. Smith* at 550-552.

{¶ 116} But a federal court hearing a habeas case must judge the merits of a prisoner's claim by applying the " 'highly deferential' " standard imposed by AEDPA. *Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That standards forbids a federal court from granting habeas relief in a collateral attack on a state court's judgment unless that decision was "contrary to" clearly established federal law, 28 U.S.C. 2254(d)(1), i.e., one in which "the state court applie[d] a rule different from the governing law set forth [by the Supreme Court] or * * * decide[d] a case differently than [the Supreme Court] has done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), citing *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, in federal

44

habeas review, reasonable, good-faith interpretations of federal constitutional precedent by state courts will stand even if subsequent federal constitutional decisions render them incorrect. *See Lockhart v. Fretwell*, 506 U.S. 364, 372-373, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). *See also Harringto*n at 102 ("If this [AEDPA] standard is difficult to meet, that is because it was meant to be"); *Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (noting that a principal function of habeas corpus is " ' "to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted" ' " and that a new rule of law does not apply on habeas review unless they are of such a nature that "without [it] the likelihood of an accurate conviction is seriously diminished" [brackets sic]), quoting *Teague v. Lane*, 489 U.S. 288, 312-313, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), quoting *Desist v. United States*, 394 U.S. 244, 262, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

**{¶ 117}** Because the standard employed in AEDPA is so highly deferential to state courts, it is virtually impossible for a federal court sitting in habeas to give relief to a juvenile. *Budder v. Addison*, 169 F.Supp.3d 1213 (W.D.Okla.2016), *appeal filed* Apr. 6, 2016, is illustrative.

**{¶ 118}** In *Budder*, a 16-year-old committed horrific crimes: he cut the throat of another juvenile and stabbed her repeatedly on her stomach, arms, and legs, and after she dove from a moving car to escape him, he raped and sexually assaulted her. The trial judge sentenced him to two terms of life imprisonment without parole for the rapes, to life imprisonment for assault and battery with a deadly weapon, and to 20 years of imprisonment for sodomy, with all sentences to be served consecutively. The state appellate court reversed in part in light of *Graham*, which was decided days after the juvenile's sentencing, and modified the sentences for the rape convictions to life imprisonment with the possibility of

parole. But even after that modification, the juvenile would not be eligible for parole until he had served almost 132 years in prison. *Id.* at 1215.

{¶ 119} Although the federal habeas court recognized that the modified aggregate sentence remained the functional equivalent of life without parole, it nevertheless found that habeas relief was not warranted. As it explained, "the court is confronting the issue of the constitutionality of [the] petitioner's sentences on habeas review, constrained by AEDPA's 'highly deferential standard * * * [which] demands that state-court decisions be given the benefit of the doubt.' " (Brackets sic.) *Id.* at 1220, quoting *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002). Applying the AEDPA standard, the court concluded that the petitioner's sentences did not violate clearly established law. *Id.*

{¶ 120} If a federal court considering an AEDPA-controlled habeas petition cannot declare that three consecutive life sentences imposed on a juvenile who would not be eligible for parole until he had served nearly 132 years in prison violates the Eighth Amendment under *Graham*, there can be no doubt how "highly deferential" the AEDPA standard is.

{¶ 121} Federal habeas jurisdiction serves an important purpose. But we must remember that federal habeas review is driven at least as much by principles of finality, comity, and respect for the sovereignty of state courts as it is driven by principles of constitutional correctness. *Harrington*, 562 U.S. at 103, 131 S.Ct. 770, 178 L.Ed.2d 624; Painter, *O'Sullivan v. Boerckel and the Default of State Prisoners' Federal Claims: Comity or Tragedy?*, 78 N.C.L.Rev. 1604, 1604-1606 (2000). *See also* Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv.L.Rev. 441, 442-444 (1963). And but for principles of finality, the rationales for AEDPA's highly deferential standard are not ones that are applicable to the consideration of App.R. 26(A)(1) applications for reconsideration, nor have we previously suggested that they were.

{¶ 122} I am not oblivious to the importance of finality in criminal decisions. "The importance of finality in any justice system, including the criminal justice system, cannot be understated." *Witt v. State*, 387 So.2d 922, 925 (Fla.1980). But the benefits of finality must be balanced with principles of fairness. *Ferguson v. State,* 789 So.2d 306, 312 (Fla.2001). As the Florida Supreme Court has held,

> The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications. Thus, society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice. Considerations of fairness and uniformity make it very "difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases."

*Witt* at 925, quoting American Bar Association, *Standards Relating to Post-Conviction Remedies* 37 (1968).

{¶ 123} This is particularly true when, as occurred in *Graham*, a court announces a new rule of law that applies retroactively.[1] *See, e.g.*, *Moore v. Biter*,

---

[1] The Supreme Court has explained the framework to be used in determining whether a rule announced should be applied retroactively to judgments in criminal cases that are already final on direct review, noting that although "a new rule is generally applicable only to cases that are still on direct review," there are two exceptions: "A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a " ' "watershed rul[e] of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.' " *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), quoting *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), quoting *Teague*, 489 U.S. at 311, 109 S.Ct. 1060, 103 L.Ed.2d 334.

725 F.3d 1184, 1190-1191 (9th Cir.2013); *In re Sparks*, 657 F.3d 258, 260 (5th Cir. 2011); *Loggins v. Thomas*, 654 F.3d 1204, 1221 (11th Cir.2011). *See also In re Williams,* 759 F.3d 66, 70 (D.C.Cir.2014) (permitting a prisoner to file a successive habeas petition based on *Graham* claims because there was a sufficient showing that *Graham* applies retroactively); *State v. Callaway*, 658 So.2d 983, 987 (Fla.1995) ("The concern for fairness and uniformity in individual cases outweighs any adverse impact that retroactive application of the rule might have on decisional finality").

**{¶ 124}** We who sit at the pinnacle of a state judiciary should be reluctant to adopt the limited standards of federal habeas jurisdiction as a proper proxy for the rigorous constitutional analysis that claims like Moore's deserve. *See State v. Ronquillo*, 190 Wash.App. 765, 361 P.3d 779, ¶ 24 (2015) (describing *Bunch v. Smith*, 685 F.3d 546, as "a habeas matter[ ] [that] is unhelpful because of the restricted standard of review"); *see also Danforth v. Minnesota*, 552 U.S. 264, 280-281, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008) (describing *Teague*'s rule of nonretroactivity as one "fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings" and "intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own State's convictions"). Indeed, even courts that refuse to apply *Graham* to lengthy term-of-years aggregate sentences question the propriety of using federal habeas cases to do so. *See State ex rel. Morgan v. Louisiana*, __ So.3d __, 2016 WL 6125428 (La. 2016), fn.8. The constitutional propriety of a 112-year aggregate sentence imposed on a defendant who committed the underlying crimes as a juvenile is a question that should be answered carefully, based on federal and state constitutional precedent rather than a rigid federal statutory scheme that has no direct application to the question before us.

***The dissents' reliance on state court decisions is an unpersuasive, post hoc rationalization for the court of appeals' abuse of discretion in refusing to consider Moore's claims***

{¶ 125} I turn now to the nonhabeas decisions cited by the dissenting justices. That authority is sparse and suspect.

{¶ 126} Both dissenting justices suggest that when the court of appeals denied Moore's application for delayed reconsideration, numerous courts had held that *Graham* is inapplicable to lengthy term-of-years sentences. But the appellate court did not cite a single case that the dissenting justices rely upon here to support the appellate court's decision. *See* 2013-Ohio-5868. Moreover, the decisions cited by the dissenting justices do not support the court of appeals' refusal to consider Moore's *Graham* claim because some of those decisions were not extant at the time[2] and the ones that did exist are poorly reasoned attempts to avoid the holding in *Graham*.

{¶ 127} Justice French relies on two state court decisions cited in *State v. Bunch*, 7th Dist. Mahoning No. 06 MA 106 (Aug. 8, 2013), and *State v. Barnette*, 7th Dist. Mahoning No. 06 MA 135 (Sept. 16, 2013) (the two judgment entries cited in the court of appeals' opinion summarily denying Moore's application for delayed reconsideration)—*State v. Kasic*, 228 Ariz. 228, 265 P.3d 410 (Ariz.App.2011), and *Henry v. State*, 82 So.3d 1084, 1089 (Fla.App.2012), *quashed*, 175 So.3d 675 (Fla.2015). Justice Kennedy includes *Kasic* in her analysis, which is more extensive but ultimately no more persuasive than Justice French's.

---

[2] Justice Kennedy includes an unpublished state intermediate-appellate court decision, *State v. Merritt*, Tenn.Crim.App. No. M2012-00829-CCA-R3CD, 2013 WL 6505145 (Dec. 10, 2013), and *Vasquez v. Commonwealth*, 291 Va. 232, 781 S.E.2d 920 (2016), as justifications for the court of appeals' denial of Moore's application for delayed reconsideration. But neither decision had been published at the time that the court of appeals announced its decision in this case and thus cannot support the court of appeals' denial of Moore's application. Accordingly, I do not consider them in my analysis.

**{¶ 128}** *Kasic* is wholly distinguishable from the present case. The defendant in *Kasic* committed a series of arsons and related crimes that spanned nearly a year and included crimes he committed as an adult. *See Kasic* at ¶ 11 and 12. There is no reason to believe that *Graham* has any application to defendants who commit crimes after they reach the age of majority. *See Roper v. Simmons*, 543 U.S. 551, 574, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest"); *State v. Bates*, 464 S.W.3d 257, 268 (Mo.App.2015) (holding that *Miller*, which holds that the imposition of mandatory sentences of life without parole on defendants who committed their crimes while under the age of 18 violates the Eighth Amendment's prohibition on "cruel and unusual punishments," is applicable only to juveniles and not to those who commit their crimes after the age of 18 years); *Humphrey v. Stewart*, No. 2:15-cv-12638, 2015 WL 4967152 (E.D.Mich. Aug. 20, 2015) ("Neither *Graham* nor *Miller* have been extended to adults offenders").

**{¶ 129}** *Henry*, the other state court decision cited in Justice French's dissent, is a Florida intermediate-appellate court decision that was pending on appeal at the time the Seventh District cited it in *Bunch* and *Barnette*. *See Henry v. State*, 107 So.3d 405 (Fla.2012) (announcing that the court had accepted jurisdiction of the cause).

**{¶ 130}** More importantly, it was subsequently quashed—unanimously— by the Florida Supreme Court. *Henry v. State*, 175 So.3d 675 (Fla.2015). In so doing, the Florida high court unequivocally concluded that *Graham* applies to juveniles who are sentenced to the functional equivalent of life without parole. *Henry* at 679-680. In language with direct application to Judge Krichbaum's stated intention in sentencing Moore, it held, "*Graham* prohibits the state trial courts from sentencing juvenile nonhomicide offenders to prison terms that ensure these

offenders will be imprisoned without obtaining a meaningful opportunity to obtain future early release during their natural lives based on their demonstrated maturity and rehabilitation." *Henry* at 680. It then reiterated,

> In light of the United States Supreme Court's long-held and consistent view that juveniles are different—with respect to prison sentences that are lawfully imposable on adults convicted for the same criminal offenses—we conclude that, when tried as an adult, the specific sentence that a juvenile nonhomicide offender receives for committing a given offense is not dispositive as to whether the prohibition against cruel and unusual punishment is implicated. Thus, we believe that the *Graham* Court had no intention of limiting its new categorical rule to sentences denominated under the exclusive term of "life in prison." Instead, we have determined that *Graham* applies to ensure that juvenile nonhomicide offenders will not be sentenced to terms of imprisonment without affording them a meaningful opportunity for early release based on a demonstration of maturity and rehabilitation. *See Graham*, 560 U.S. at 75, 130 S.Ct. 2011 [176 L.Ed.2d 825].

> In light of *Graham*, and other Supreme Court precedent, we conclude that the Eighth Amendment will not tolerate prison sentences that lack a review mechanism for evaluating this special class of offenders for demonstrable maturity and reform in the future because any term of imprisonment for a juvenile is qualitatively different than a comparable period of incarceration is for an adult.

*Henry* at 680.

**{¶ 131}** Decisions like *Kasic*, *Henry*, *Bunch*, and *State v. Brown*, 118 So.3d 332 (La.2013), are unpersuasive for at least two reasons.

**{¶ 132}** First, as the Nevada Supreme Court has recognized, these decisions ignore that the United States Supreme Court did nothing in *Graham* to specifically limit its holding to offenders who were convicted of a single nonhomicide offense. *State v. Boston*, 363 P.3d 453, 457 (Nev.2015). And *Miller*, which was decided after *Graham* but before the Seventh District's denial of Moore's application for delayed reconsideration, involved a juvenile offender who had been convicted of multiple crimes, *see* 132 S.Ct. at 2461, 183 L.Ed.2d 407, but the Supreme Court offered no indication in *Miller* that the fact that the juvenile had been convicted of multiple crimes affected its analysis.

**{¶ 133}** Second, these decisions ignore the foundational rationales for the high court's prohibition on state court sentences, imposed at the outset, that forever prohibit consideration of a juvenile offender's ability to reenter society. "[T]he teachings of the *Roper*/*Graham*/*Miller* trilogy require sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's 'diminished culpability and greater prospects for reform' when, as here, the aggregate sentences result in the functional equivalent of life without parole." *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132, ¶ 33, quoting *Miller* at 2464. Whether the principles of *Graham* apply in a given case should not turn "on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates" but, rather, on the Supreme Court's repeated emphasis "in *Roper, Graham*, and *Miller* of the lessened culpability of juvenile offenders, how difficult it is to determine which juvenile offender is one of the very few that is irredeemable, and the importance of a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *State v. Null*, 836 N.W.2d 41, 71-72 (Iowa 2013), quoting *Graham*, 560 U.S. at 75, 130 S.Ct. 2011, 176 L.Ed.2d 825.

**{¶ 134}** Lastly, I note that to the extent Justice Kennedy believes that *Graham* is distinguishable from this appeal, *see* dissenting opinion of Kennedy, J., at 4-5, her sole authority is Justice Alito's *dissenting* opinion in *Graham*—a summary analysis that no other justice joined, *see Graham* at 124-125 (Alito, J., dissenting). But a dissent is just that: "[a] disagreement with a majority opinion," *Black's Law Dictionary* 574 (10th Ed.2014), without force of law or precedential value. Even if Justice Alito's dissenting opinion had persuasive value, it is not binding on this court. We must adhere to the majority opinions of the United States Supreme Court on federal constitutional matters because it is the ultimate arbiter of the federal Constitution, *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), just as our trial and intermediate appellate courts must adhere to our majority opinions because we are the ultimate arbiters of Ohio law, *Addis v. Howell*, 137 Ohio App.3d 54, 57-58, 738 N.E.2d 37 (2d Dist.2000); *accord Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

**CONCLUSION**

**{¶ 135}** *Graham* is one of the most momentous decisions in American juvenile law. Given its significance, the stated intention of the sentencing judge in this case, the de facto life sentence he imposed, and the curtness with which the court of appeals denied Moore's application to reconsider his sentence in light of *Graham*, I conclude that the appellate court abused its discretion in refusing to consider Moore's claim. The court was not bound to accept his arguments, but it was bound to consider them more thoughtfully after allowing the application for delayed reconsideration.

**{¶ 136}** I concur fully in the majority opinion, which addresses the significant constitutional question that is properly before us and which holds that the court of appeals abused its discretion in failing to recognize that extraordinary circumstances were presented by Moore's application, i.e., the unconstitutional imposition of a lengthy term-of-years sentence on a juvenile offender.

_____

**LANZINGER, J., concurring.**

{¶ 137} I concur in the majority's holding that an aggregate prison term for multiple offenses that extends beyond the defendant's natural lifespan is a life-without-parole sentence by another name. Therefore, *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), which forbids imposition of life-without-parole sentences for juvenile nonhomicide offenders, applies to this case. I also agree that allowing review of the 112-year sentence of appellant, Brandon Moore, only after 77 years when he is 92 does not provide the "meaningful opportunity to obtain release" that *Graham* requires, *id.* at 75.

{¶ 138} But I write separately due to concern that in simply remanding for "resentencing in conformity with *Graham*," majority opinion at ¶ 100, we leave unaddressed the problem of *when* the "meaningful opportunity" would take place. While we hold that 77 years is too long to wait, how exactly does the trial court follow our instruction and resentence Moore? What is a constitutional sentence, and how is it arrived at? We have chosen not to say.

{¶ 139} Unfortunately, no statute is on point and, in fact, Ohio felony-sentencing law now seems to encourage the longest prison terms for multiple offenses as there is no limit on the number of consecutive sentences a trial court may impose once the trial court makes any of the findings required by R.C. 2929.14(C)(4). We upheld against an Eighth Amendment attack the imposition of maximum, consecutive sentences for an aggregate term of 134 years for the nonhomicide offenses of a 24-year-old in *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073. Just as in Moore's case, Hairston received separate terms for firearm specifications as well as the longest term within the authorized range for each individual offense, all to be served consecutively. *Id.* at ¶ 9. In my separate opinion in *Hairston*, the General Assembly was asked to consider restoring guidelines to establish when consecutive sentences are

appropriate so as to discourage the routine "max and stack" of prison terms in multiple-count indictments. *Id.* at ¶ 28-33 (Lanzinger, concurring). Although it subsequently enacted R.C. 2929.14(C)(4), as part of 2011 Am.Sub.H.B. No. 86, effective September 30, 2011, to require trial courts to make certain statutory findings before imposing consecutive sentences, the General Assembly did not place any limit on the length of these aggregate sentences. Because the General Assembly has yet to address "max and stack" sentencing, it is unlikely to quickly enact a new statute to govern the judicial release of offenders who committed their offenses while juveniles.

{¶ 140} In the absence of specific statutory authority then, on remand in this case, the trial court must determine at what point in his sentence Moore should be allowed the chance to demonstrate his maturity and rehabilitation to potentially obtain an earlier release from custody. The court may not just provide a review date for parole or judicial release in the sentencing entry as it must still follow current law.

{¶ 141} I believe the existing judicial-release statute can help the court in choosing a sentence that will satisfy *Graham* even though the statute itself does not mention the specific situation before us. Judicial release is governed by R.C. 2929.20. Those eligible are defined in R.C. 2929.20(A), and unless certain offenses have been committed, none of which were committed in Moore's case, the length of the nonmandatory-prison term determines the time for application. *See* R.C. 2929.20(C). Moore's aggregate 112-year prison sentence consists of 12 years of mandatory time for four, three-year gun specifications, with the remainder of his sentence being ten maximum prison terms of ten years each for first-degree felonies, *see* former R.C. 2929.14(A)(1), Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, 7464 (providing for maximum ten-year sentence for first-degree felonies

committed by Moore at time of his resentencing).[3]  As the record shows, the trial judge intended to and did impose the harshest penalty possible by imposing all the felony terms consecutively:  "[I]t is the intention of this court that you should never be released from the penitentiary."

{¶ 142} On resentencing, however, the trial court must craft a sentence that will allow Moore a meaningful opportunity to obtain judicial release before he is 92.  Because mandatory time must be served without reduction, the court must resentence Moore the same way on the four firearm specifications for at least 12 years of mandatory and consecutive time.  The rest of his sentence is subject to the court's modification.  It must be emphasized again that allowing Moore an earlier opportunity to apply for judicial release does not guarantee the release.  It allows him the chance to persuade the judge that he need not be in prison for the rest of his natural life.  The timing of eligibility will depend on the court's sentencing decision.

{¶ 143} I suggest that to remain in accord with the sentencing statutes, the trial court may either reduce the maximum penalties on some or all of the underlying ten felonies or may decide to impose some or all of them concurrently rather than consecutively.  To illustrate, if the court were to grant minimum sentences for all ten underlying felonies, Moore would be sentenced to 12 plus 30 years for a stated prison term of 42 years.  *See* R.C. 2929.14(A)(1) (providing for three-year minimum term for first-degree felonies committed by Moore).  Under the judicial-release statute, this would mean that he would have an opportunity to apply for judicial release after serving 21 years, when he would be 36 years old.  *See* R.C. 2929.20(C)(5) (if the aggregated nonmandatory term or terms is more than ten years, the earliest opportunity is one-half of the stated prison term).  Alternatively, the court could impose concurrent sentences for some or all of the first-degree felonies.  For example, Moore was found guilty of three rapes and three

[3] Moore was also sentenced to a six-month term for aggravated menacing to be served concurrently with the felony sentences.

conspiracies to commit rape. If all these sentences remained maximum terms but were made concurrent, the prison term for these six offenses would be 10 years instead of 60, and without any other modification, would allow Moore to apply for judicial release at age 46 after serving 31 years (one-half of the stated prison term of 62 years).

{¶ 144} These are just two examples of ways in which the trial court at resentencing can allow Moore's eligibility for judicial release before the passage of 77 years.

{¶ 145} Of course, the General Assembly could choose an entirely new method to ensure that *Graham*'s requirements are followed by enacting specific time limits for one who was a juvenile at the time of the offense to have a meaningful opportunity to obtain release. My suggestions are offered only as a temporary approach to implementing this court's instructions upon remand.

————————————

**KENNEDY, J., dissenting**.

{¶ 146} Because the court of appeals was without authority to consider the motion for delayed reconsideration and because *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), does not extend to a juvenile offender sentenced to consecutive, fixed prison terms for multiple nonhomicide offenses, I dissent. I would affirm the judgment of the court of appeals.

{¶ 147} While I agree with the majority's statement of the facts and procedural history of this case, it is important to emphasize several dates and court decisions.

{¶ 148} Moore was convicted in 2002. He appealed his convictions several times, but on March 24, 2009, the court of appeals issued a judgment that affirmed his resentencing. *State v. Moore*, 7th Dist. Mahoning No. 08 MA 20, 2009-Ohio-1505 ("*Moore III*"). Moore did not appeal that judgment. On September 16, 2013, approximately four years after his convictions became final and nearly three years

after *Graham* was decided, Moore filed a motion for delayed reconsideration of *Moore III* for the purpose of arguing that *Graham* applied to his sentence.

### I. Delayed Reconsideration of *Moore III*

{¶ 149} An appellate court's decision regarding an application for reconsideration of its judgment is reviewed under an abuse-of-discretion standard. *Reichert v. Ingersoll*, 18 Ohio St.3d 220, 222, 480 N.E.2d 802 (1985). An " ' "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *State ex rel. Associated Builders & Contrs. of Cent. Ohio v. Franklin Cty. Bd. of Commrs.*, 125 Ohio St.3d 112, 2010-Ohio-1199, 926 N.E.2d 600, ¶ 43 (Pfeifer, J., dissenting), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 150} "Courts of appeal[s] have jurisdiction to reconsider their judgments on a timely motion filed pursuant to App.R. 26 until an appeal as of right is filed in this court, or this court rules on a motion to certify the record." *State ex rel. LTV Steel Co. v. Gwin*, 64 Ohio St.3d 245, 249, 594 N.E.2d 616 (1992), citing *State v. Murphy*, 49 Ohio St.3d 293, 551 N.E.2d 1292 (1990), and *Cincinnati v. Alcorn*, 122 Ohio St. 294, 171 N.E. 330 (1930). And "by virtue of the jurisdiction conferred by Section 3(B), Article IV, Ohio Constitution, courts of appeals also have inherent authority, in the furtherance of justice, to reconsider their judgments sua sponte." *LTV Steel* at 249, citing *Tuck v. Chapple*, 114 Ohio St. 155, 151 N.E. 48 (1926).

{¶ 151} However, under Article IV, Section 3(A)(3) of the Ohio Constitution, judgments of the courts of appeals "are final unless appealed as of right or by a request for [the Supreme Court's] discretionary review pursuant to Section 2(B)(2), Article IV, Ohio Constitution." *LTV Steel* at 249. "[I]f no such appeal is filed, the judgment is binding and no longer subject to the court of appeals' jurisdiction to reconsider." Id. at 249-250, citing *Wigton v. Lavender*, 9 Ohio St.3d 40, 43, 457 N.E.2d 1172 (1984).

**{¶ 152}** Under App.R. 26(A)(1), a party may seek reconsideration no later than ten days after the clerk of courts has mailed the judgment or order to the parties. However, applying App.R. 14(B), courts of appeals have held that upon " 'a showing of *extraordinary circumstances*,' " they may accept an application for reconsideration beyond the ten-day limit. (Emphasis added.) *E.g., Rice v. Rice*, 7th Dist. Columbiana No. 2001-CO-28, 2002-Ohio-5032, ¶ 2, quoting App.R. 14(B). But under *LTV Steel*, no court of appeals can reconsider its judgment if the time for appealing that judgment to this court has expired and no appeal was filed.

**{¶ 153}** On March 24, 2009, the court of appeals affirmed the trial court's resentencing of Moore for his 2002 convictions. Under *LTV Steel*, the court of appeals had jurisdiction to reconsider its judgment in *Moore III* until Moore appealed that judgment to this court or the 45-day appeal period expired. Moore did not appeal *Moore III* and did not file his application for reconsideration until September 16, 2013, more than four years after *Moore III* was decided and approximately three years after *Graham* was decided. Therefore, the court of appeals lacked authority to reconsider *Moore III*. Accordingly, the court of appeals did not abuse its discretion in denying Moore's application for reconsideration.

## II. *Graham* Is Distinguishable

**{¶ 154}** It is important to understand what the United States Supreme Court decided and what it did not decide in *Graham*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825. In *Graham*, the juvenile defendant was found guilty of armed burglary and attempted armed robbery and ultimately sentenced to life imprisonment for the armed burglary and 15 years for the attempted armed robbery. Because Florida had abolished its parole system, Graham's life sentence was a sentence for life *without parole*. *Id*. at 57.

**{¶ 155}** The court in *Graham* did not decide whether the imposition of consecutive, fixed-term prison sentences for multiple nonhomicide offenses that result in a lengthy aggregate sentence violate the Eighth Amendment. As pointed

out in Justice Alito's dissent in the case: "[*Graham*] holds only that 'for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of *life without parole*.' * * * Nothing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole." (Emphasis sic.) *Id.* at 124 (Alito, J., dissenting), quoting *id.* at 74.

### III. An Invitation to Extend Graham Was Denied

{¶ 156} One of Moore's codefendants, Chaz Bunch, was convicted of aggravated robbery, three counts of rape, three counts of complicity to commit rape, kidnapping, conspiracy to commit aggravated robbery—all with firearm specifications—and aggravated menacing. *State v. Bunch*, 7th Dist. Mahoning No. 02 CA 196, 2005-Ohio-3309. Similar to the trial judge in Moore's case, the trial judge who sentenced Bunch imposed maximum, consecutive sentences on each offense, except for the menacing charge, which resulted in an aggregate 115-year prison term. The court of appeals affirmed Bunch's convictions (except for his conspiracy conviction) but remanded for resentencing, resulting in a new aggregate sentence of 89 years in prison. The court of appeals affirmed the new sentence, *State v. Bunch*, 7th Dist. Mahoning No. 06MA 106, 2007-Ohio-7211, and we denied Bunch's discretionary appeal, *State v. Bunch*, 118 Ohio St.3d 1410, 2008-Ohio-2340, 886 N.E.2d 872.

{¶ 157} Thereafter, Bunch filed a petition for a writ of habeas corpus in federal district court, alleging that his 89-year sentence was cruel and unusual punishment in violation of the Eighth Amendment. *Bunch v. Smith*, N.D.Ohio No. 1:09 CV 901, 2010 WL 750116 (Mar. 2, 2010). *Graham* was pending in the Supreme Court at the time, but the federal district court declined to stay consideration of Bunch's petition, finding *Graham* distinguishable because *Graham* involved a life sentence without the possibility of parole. *Id*. at *2. Consequently, the court dismissed Bunch's petition. *Id*. at *3.

{¶ 158} Thereafter, Bunch appealed to the Sixth Circuit Court of Appeals. *Bunch v. Smith*, 685 F.3d 546 (6th Cir.2012). While his appeal was pending, the Supreme Court decided *Graham*.

{¶ 159} A writ of habeas corpus will issue only if the holding at issue is " 'contrary to, or involve[s] an unreasonable application of, clearly established Federal law.' " *Greene v. Fischer*, __ U.S. __, 132 S.Ct. 38, 45, 181 L.Ed.2d 336 (2011), quoting 28 U.S.C. 2254(d)(1). "[C]learly established Federal Law" means the law that existed at the time of "the last state-court adjudication on the merits." *Id*.

{¶ 160} Even though *Graham* was not decided until after Bunch had exhausted his state appeals, the Sixth Circuit nevertheless determined that an argument could be made that *Graham* applies retroactively on collateral review under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Bunch v. Smith* at 550. However, the court determined that it did not need to address that "threshold question" because even if the court assumed that *Graham* did apply retroactively, "[it] is not clearly applicable to [Bunch]." *Bunch v. Smith* at 550. The Sixth Circuit's reasoning in reaching this decision is persuasive support for the conclusion that *Graham* does not extend to Moore's case.

{¶ 161} The Sixth Circuit recognized that while both cases involved juveniles who committed nonhomicide offenses, *Graham* involved a sentence of life in prison while Bunch's case involved "consecutive, fixed-term sentences—the longest of which was 10 years—for committing multiple nonhomicide offenses." *Bunch v. Smith,* 685 F.3d at 551. The court observed that *Graham* "made it clear that [it] 'concerns *only* those juvenile offenders sentenced to *life without parole* solely for a nonhomicide offense.' " (Emphasis sic.) *Bunch v. Smith* at 551, quoting *Graham*, 560 U.S. at 63, 130 S.Ct. 2011, 176 L.Ed.2d 825. The Sixth Circuit pointed out that *Graham*'s analysis confirms this limitation by "not encompass[ing] consecutive fixed-term sentences": *Graham* "did not analyze

sentencing laws or actual sentencing practices regarding consecutive, fixed-term sentences for juvenile nonhomicide offenders." *Bunch v. Smith* at 551-552. The Sixth Circuit added, " 'If the [United States] Supreme Court has more in mind, it will have to say what that is.' " *Id.* at 552, quoting *Henry v. State*, 82 So.3d 1084, 1089 (Fla.App.2012), *quashed*, 175 So.3d 675 (Fla.2015).

{¶ 162} Bunch appealed to the United States Supreme Court, which denied certiorari. *Bunch v. Bobby*, __ U.S. __, 133 S.Ct. 1996, 185 L.Ed.2d 865 (2013).

## IV. Other Jurisdictions Recognize that Graham's Holding Is Limited

{¶ 163} While the majority points to courts in some jurisdictions that have extended *Graham* to cases involving consecutive, fixed-term sentences for multiple nonhomicide offenses, courts in other jurisdictions have not done so. The Louisiana Supreme Court has held that *Graham* does not apply to a juvenile offender who has been sentenced to multiple sentences that, when aggregated, result in a lengthy term-of-years sentence. And courts in Tennessee, Arizona, and Virginia have all recognized that *Graham*'s holding is limited to cases in which the defendant received an actual life sentence without the possibility of parole for a nonhomicide offense committed while a juvenile.

### A. Louisiana

{¶ 164} The majority cites *State ex rel. Morgan v. State*, __So.3d__, 2016 WL 6125428 (La.2016), a Louisiana Supreme Court decision, in support of its holding that *Graham* applies to Moore's sentence. As the majority asserts, in *Morgan*, the court held that "the categorical rule in *Graham* applies to the defendant's 99-year sentence without parole insofar as it is the functional equivalent of a life sentence and denies him a meaningful opportunity for release, to which he is entitled." *Id.* at *8. However, noting that Morgan was sentenced to a *single* 99-year term, the court distinguished the case from *State v. Brown*, 118 So.3d 332 (La.2013), in which it had addressed the application of *Graham* to a different sentence three years earlier. *Morgan* at *4.

{¶ 165} In *Brown*, a juvenile was convicted of aggravated kidnapping and four counts of armed robbery. The trial court imposed a mandatory life sentence for aggravated kidnapping and ten years in prison for each of the armed-robbery convictions to be served consecutively for 40 additional years, without the possibility of parole for any of the convictions.

{¶ 166} Brown filed a motion challenging his sentence as illegal under *Graham*. The trial court agreed, holding that Brown was eligible for parole on all five convictions, and the intermediate appellate court affirmed. The Louisiana Supreme Court "granted the State's writ application to consider its argument that while the district court properly eliminated the parole restriction on the life sentence, nothing in *Graham* authorized it to amend [Brown's] four 10-year armed robbery sentences." *Brown* at 334-335. The court recognized that following *Graham*, the legislature had amended a state sentencing statute in order to allow inmates serving a life sentence without the possibility of parole for a nonhomicide offense committed while a juvenile to become eligible for parole after serving 30 years. *Brown* at 341.

{¶ 167} The court then considered whether *Graham* applied to Brown's sentence. Brown was 16 years old at the time of his offenses. Therefore, Brown would not become eligible for parole until at least age 86—once he had served 30 years for the kidnapping conviction and ten years for each of the four armed-robbery convictions. *Brown*, 118 So.3d at 342. The court stated:

> In our view, *Graham* does not prohibit consecutive term of year sentences for multiple offenses committed while a defendant was under the age of 18, even if they might exceed a defendant's lifetime, and, absent any further guidance from the United States Supreme Court, we defer to the legislature which has the constitutional authority to authorize such sentences.

*Brown* at 341-342.

{¶ 168} The *Brown* court concluded that "nothing in *Graham* addresses a defendant convicted of multiple offenses and given term of year sentences, that, if tacked on to the life sentence parole eligibility date, equate to a possible release date when the defendant reaches the age of 86." *Brown* at 342.

{¶ 169} The court in *Morgan* distinguished *Brown*:

> Brown was convicted of *five* offenses resulting in *five consecutive sentences* which, when aggregated, resulted in a term pursuant to which he would have no opportunity for release; here, the defendant was convicted of a single offense and sentenced to a single term which affords him no opportunity for release. In declining to extend *Graham* to modify any of Brown's term-of-years sentences, we were most influenced by the fact that his actual duration of imprisonment would be so lengthy only because he had committed five offenses. * * * In contrast, any concern about a policy that would afford an opportunity for parole to defendants convicted of multiple offenses is not implicated here.

(Emphasis added.) *Morgan*, __So.3d__, 2016 WL 6125428, at *4. Therefore, *Brown* continues to stand for the proposition that *Graham* does not apply to a juvenile offender who has been sentenced to multiple sentences that, when aggregated, result in a lengthy term-of-years sentence. Similar to the juvenile defendant in *Brown*, Moore was a juvenile offender who had been sentenced to multiple sentences that, when aggregated, result in a lengthy term-of-years sentence. Consequently, contrary to the majority's assertion, Louisiana Supreme

Court precedent is still consistent with the conclusion that *Graham* is not applicable to Moore's lengthy term-of-years sentence.

### B. Tennessee

{¶ 170} In *State v. Merritt*, the defendant pleaded guilty to nine counts of rape of a child committed when the defendant was 17 years old. Tenn.Crim.App. No. M2012-00829-CCA-R3CD, 2013 WL 6505145 (Dec. 10, 2013). The trial court imposed a 25-year prison term for each of the nine offenses to be served consecutively, for an aggregate prison sentence of 225 years.

{¶ 171} On appeal, Merritt argued that his prison sentence was a de facto life sentence without the possibility of parole and constituted cruel and unusual punishment under *Graham*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825. Although the Tennessee Court of Criminal Appeals reversed the sentence after determining that it was excessive, the court rejected Merritt's argument that his sentence was unconstitutional under *Graham*. *Merritt* at *6. The court reasoned:

> Although the Defendant's effective 225-year sentence is the equivalent of life imprisonment, the sentence does not violate *Graham*'s specific holding because he was not sentenced to life imprisonment without the possibility of parole. We conclude that *Graham* applies *only to juveniles sentenced to life imprisonment without the possibility of parole* for nonhomicide offenses and that the Defendant is not entitled to relief on this basis.

(Emphasis added.) *Merritt* at *6.

### C. Arizona

{¶ 172} In *State v. Kasic*, the defendant was found guilty of, among other offenses, six arsons and one attempted arson—some of which he committed at the age of 17—and the court imposed an aggregate prison term of 139.75 years. 228

Ariz. 228, 265 P.3d 410 (Ariz.App.2011). On appeal, Kasic argued that the "reasons underlying the Court's decision in *Graham* are applicable to juveniles, such as [Kasic], serving a term-of-years sentence exceeding the juvenile's life expectancy." *Kasic* at ¶ 20. The Arizona Court of Appeals disagreed, reasoning that *Graham* " 'concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense.' " *Kasic* at ¶ 20, quoting Graham at 63. The court gleaned further support for its conclusion in recognizing that "[*Graham*] emphasized 'that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life.' " *Kasic* at ¶ 20, quoting *Graham* at 75.

### *D. Virginia*

**{¶ 173}** In *Vasquez v. Commonwealth*, two juveniles, Vasquez and Valentin, robbed and repeatedly sexually assaulted a woman. 291 Va. 232, 781 S.E.2d 920 (2016), *cert. denied*, __ U.S. __, __ S.Ct. __, __ L.Ed.2d __, 2016 WL 4380983 (Dec. 5, 2016). After a bench trial, the court found both defendants guilty of multiple criminal offenses and imposed multiple term-of-years sentences. Ultimately, Vasquez received an aggregate sentence of 133 years in prison and Valentin received an aggregate sentence of 68 years in prison. Vasquez and Valentin appealed to the Virginia Court of Appeals, which denied relief to both.

**{¶ 174}** Vasquez and Valentin appealed to the Virginia Supreme Court, arguing that their sentences constituted cruel and unusual punishment and urging the court to "expand *Graham*'s prohibition of life-without-parole sentences to nonlife sentences that, when aggregated, exceed the normal life spans of juvenile offenders." *Vasquez* at 241. The court refused to extend *Graham*, noting that *Graham* applied "only to 'the imposition of a *life without parole sentence* on a juvenile offender who did not commit homicide.' " (Emphasis added in *Vasquez.*) *Id.*, quoting *Graham*, 560 U.S. at 82, 130 S.Ct. 2011, 176 L.Ed.2d 825. The court

recognized that both Vasquez and Valentin were subject to multiple sentences and that "[t]he only reason that the aggregate sentences exceeded their life expectancies was because they committed so many separate crimes. These cases are nothing like *Graham*, which involved a single crime resulting in a single life-without-parole sentence." *Id.* at 243. The court concluded:

> We find no basis for declaring the aggregate sentences imposed on Vasquez and Valentin to be cruel and unusual under the Eighth Amendment. Nothing in *Graham* dictates that multiple sentences involving multiple crimes be treated, for Eighth Amendment purposes, in exactly the same manner as a single life-without-parole sentence for a single crime.

*Id.* at 251.

## V. *Graham*'s Analysis Is Insufficient to Justify Extending Its Holding to Consecutive, Fixed-Term Sentences for Multiple Nonhomicide Offenses

{¶ 175} Even assuming for the sake of argument that *Graham* could apply to consecutive, fixed-term sentences for multiple nonhomicide offenses, there are practical problems that require additional inquiry and might preclude the extension of *Graham*.

### A. Determining Life Expectancy Is a Slippery Slope

{¶ 176} The majority uses life-expectancy data reported by the Centers for Disease Control ("CDC") to conclude that Moore will *probably* die before he becomes eligible to be released. But there are a myriad of sources for determining life expectancy. For example, in *Boneshirt v. United States*, the defendant was convicted of a murder committed as a juvenile and sentenced to 48 years in prison. D.S.D. No. CIV 13-3008-RAL, 2014 WL 6605613 (Nov. 19, 2014). Boneshirt claimed that his sentence was a de facto life sentence and therefore unconstitutional

under *Miller v. Alabama*, __ U.S. __, 132 U.S. 2455, 183 L.Ed.2d 407 (sentencing a juvenile offender who commits murder to a mandatory life sentence violates the Eighth Amendment).  In exploring whether Boneshirt's sentence was a de facto life sentence, the court considered numerous sources, including statistics from the United States Sentencing Commission, Internal Revenue Service (IRS) actuarial tables, and Social Security actuarial tables, as well as a mortality study showing particularly low life expectancies for Native American males in certain South Dakota counties.  The court noted that while it is "easy" to view a 100-year sentence as a de facto life sentence, Boneshirt's 48-year sentence, which he began serving at age 18, "makes for a more difficult answer."  *Boneshirt* at \*9.  Undoubtedly, determining whether a lengthy term-of-years aggregate sentence is a de facto life sentence will be a difficult, case-by-case determination.

{¶ 177} Moreover, data can be used only to *estimate* one's life expectancy, as there are numerous factors that can affect an individual's actual lifespan.  For example, according to the CDC, life expectancy is at least ten years shorter for smokers than for nonsmokers.  CDC, *Tobacco-Related Mortality*, http://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/tobacco_related_mortality/ (accessed Oct. 18, 2016).  Would courts need to take such personal factors into account when determining life expectancy?

{¶ 178} Similarly, as imprisoned juveniles grow older, some will encounter new health issues that could shorten their lives.  Would courts have to periodically reevaluate each juvenile's health and lifestyle for the purpose of re-estimating the juvenile's life expectancy?

{¶ 179} There are many sources for life-expectancy data and many factors that affect an individual's life expectancy, and neither *Graham* nor the majority have explored these issues.

*B. Determination of National Consensus as Required by* Graham*'s*
*Categorical-Rule Analysis*

**{¶ 180}** The categorical-rule analysis employed in *Graham* included two steps. 560 U.S. at 61, 130 S.Ct. 2011, 176 L.Ed.2d 825.

**{¶ 181}** The first step required the court to determine whether there was a national consensus against sentencing juvenile offenders who commit nonhomicide offenses to a sentence of life in prison without parole, and the second step required the court to apply its own Eighth Amendment decisions to determine whether that sentencing practice violated the Eighth Amendment. *Id*. at 61-62. The results of the first step of the analysis, national consensus, while "not [ ] determinative of whether a punishment is cruel and unusual is 'entitled to great weight.' " *Id.* at 67, quoting *Kennedy v. Louisiana*, 554 U.S. 407, 434, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008). The court in *Graham* determined whether there was a national consensus against sentencing a juvenile who committed a nonhomicide offense to life in prison without parole, not whether there was a national consensus against sentencing a defendant who committed multiple nonhomicide offenses while a juvenile to consecutive, fixed prison terms that exceed the offender's life expectancy. Arguably, consideration of whether there is a national consensus against the latter type of sentence could yield a different result. Without this analysis, *Graham* cannot be extended to consecutive, fixed-term sentences for multiple nonhomicide offenses like Moore's. The majority opinion never even addresses the first step of the categorical-rule analysis employed in *Graham*.

**VI. The Separation-of-Powers Doctrine Grants the General Assembly Sole Authority to Enact Sentencing Guidelines**

**{¶ 182}** The United States Supreme Court "leave[s] to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Ford v. Wainwright*, 477 U.S. 399, 416, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (plurality opinion). It is well settled that "[t]he power to

define and classify and prescribe punishment for felonies committed within the state is lodged in the General Assembly of the state." *State v. O'Mara*, 105 Ohio St. 94, 136 N.E. 885 (1922), syllabus, *rev'd in part on other grounds*, *Steele v. State*, 121 Ohio St. 332, 333, 168 N.E. 846 (1929). Accordingly, "the authority for a trial court to impose sentences derives from the statutes enacted by the General Assembly." *State v. Bates*, 118 Ohio St.3d 174, 2008-Ohio-1983, 887 N.E.2d 328, ¶ 12.

{¶ 183} In determining whether imposing a life sentence on a juvenile nonhomicide offender violated the Eighth Amendment, the court in *Graham* looked to "science" and concluded that juveniles are different from adults in that juveniles are " 'more vulnerable or susceptible to negative influences and outside pressures, including peer pressure;' and their characters are 'not as well formed.' " 560 U.S. at 68, 130 S.Ct. 2011, 176 L.Ed.2d 825, quoting *Roper v. Simmons*, 543 U.S. 551, 569-570, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Pursuant to this "science," the court concluded that " '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id.* at 68, quoting *Roper* at 573. The court also considered "penological justifications" (e.g., retribution, deterrence, incapacitation, rehabilitation) for imposing a life sentence on a juvenile nonhomicide offender. *Id.* at 71.

{¶ 184} While I agree that the science and penological considerations are relevant in formulating a sentence, these subjects are for the General Assembly—not the courts—to debate and weigh in establishing sentencing guidelines for juvenile offenders. *See O'Mara*, 105 Ohio St. 94, 136 N.E. 885, at syllabus. To do so here by extending *Graham* to consecutive, fixed-term sentences for multiple nonhomicide offenses will effectively invalidate the sentences imposed for certain

offenses, which will have the effect of permitting an offender to commit some offenses "for free."

{¶ 185} The General Assembly has made a policy decision creating a bindover scheme for a juvenile defendant who commits one of a multitude of types of offenses at a certain age. R.C. 2152.10. Therefore, it is the General Assembly that must consider relevant factors, such as the growing body of science and pronouncements by the United States Supreme Court, and promulgate appropriate sentencing guidelines for those juveniles whom the General Assembly has deemed must be subjected to adult consequences.

{¶ 186} And it is this court's obligation to educate Ohio judges who would pass consecutive, fixed-term sentences for multiple nonhomicide offenses committed by a juvenile about the vulnerability and susceptibility of juveniles to negative influences and peer pressure, the science of brain development and the growing body of evidence that juveniles' characters are not as well formed as those of adults, and the law as enunciated by the United States Supreme Court that a trial judge can fashion an individualized sentence to meet the overriding purposes of felony sentencing, *see* R.C. 2929.11.

{¶ 187} While I would gladly add my voice to the conversation supporting the creation of separate sentencing guidelines for juvenile offenders who are bound over to the adult system, I cannot join today's majority when there is no basis in law and when to do so, in my opinion, would violate the separation-of-powers doctrine, which "[t]his court has repeatedly affirmed" is embedded in the Ohio Constitution, *State ex rel. Bray v. Russell*, 89 Ohio St.3d 132, 134, 729 N.E.2d 359 (2000).[4]

---

[4] During the 131st session of the General Assembly, the legislature considered a bill to "enact section 2967.132 of the Revised Code to provide special parole eligibility dates for persons with an indefinite or life sentence imposed for an offense committed when the person was less than 18 years of age." Am.H.B. No. 521, at 1.

### VII. Conclusion

{¶ 188} Because the court of appeals was without authority to consider the application for delayed reconsideration and because Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825, does not extend to a juvenile offender who is sentenced to consecutive, fixed prison terms for multiple nonhomicide offenses, I dissent. I would affirm the judgment of the court of appeals.

O'DONNELL, J., concurs in the foregoing opinion.

_____

**FRENCH, J., dissenting.**

{¶ 189} I respectfully dissent.

{¶ 190} This discretionary appeal stems from the application of appellant, Brandon Moore, for delayed reconsideration of his direct appeal from his resentencing pursuant to *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. Moore asks us to decide whether the constitutional prohibition against life-without-parole sentences for juvenile nonhomicide offenders announced in *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), and extended to mandatory life-without-parole sentences for juvenile homicide offenders in *Miller v. Alabama*, __ U.S. __, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), also prohibits lengthy term-of-years sentences that approximate de facto life sentences. But we need not reach the constitutional question because, no matter how the court decides it, the Seventh District Court of Appeals did not abuse its discretion by denying Moore's application for delayed reconsideration. I would therefore affirm the court of appeals' judgment.

{¶ 191} On March 24, 2009, the Seventh District affirmed Moore's resentencing, following the remand pursuant to *Foster*, and rejected Moore's pro se assignment of error that the resentencing violated his right to due process. *State v. Moore*, 7th Dist. Mahoning No. 08 MA 20, 2009-Ohio-1505 ("*Moore III*"). The court noted that this was Moore's third appeal, that most issues with respect to his

convictions and sentence were res judicata, and that its review was limited to issues arising from Moore's most recent resentencing. Moore did not appeal the March 24, 2009 decision.

{¶ 192} On September 16, 2013, Moore filed an application for delayed reconsideration of *Moore III* pursuant to App.R. 26(A)(1) and 14(B). The standard for reviewing an application for reconsideration is whether the application calls to the court's attention an obvious error in its decision or raises an issue that the court either did not consider at all or did not consider fully when it should have. *Matthews v. Matthews*, 5 Ohio App.3d 140, 450 N.E.2d 278 (10th Dist.1981), paragraph two of the syllabus. Moore argues that his sentence violates the constitutional rule established in *Graham*.

{¶ 193} Moore's application for reconsideration was unquestionably untimely under App.R. 26(A)(1), but the court of appeals implicitly recognized— consistent with the majority opinion's holding here—that it had authority, pursuant to App.R. 14(B), to permit the untimely filing upon a showing of extraordinary circumstances. App.R. 14(B) authorizes a court of appeals to enlarge the time for doing any act or to permit the act to be done after the expiration of the prescribed time upon a showing of good cause, but "[e]nlargement of time to file an application for reconsideration * * * pursuant to App. R. 26(A) shall not be granted except on a showing of extraordinary circumstances." Relief under App.R. 14(B) is subject to the court of appeals' discretion. *L.R. Patrick, Inc. v. Karlsberger & Assocs., Architects, Inc.*, 10th Dist. Franklin No. 81AP-70, 1981 WL 3231, *1 (June 4, 1981).

{¶ 194} I agree with both the majority opinion and Justice Kennedy's dissenting opinion that the appropriate standard of review in this case is abuse of discretion. *See Reichart v. Ingersoll*, 18 Ohio St.3d 220, 222, 224, 480 N.E.2d 802 (1985). An abuse of discretion connotes a decision that is unreasonable, arbitrary or unconscionable. *Gen. Motors Corp. v. Tracy*, 73 Ohio St.3d 29, 32, 652 N.E.2d

188 (1995). Assuming that the court of appeals had authority under App.R. 14(B) to consider Moore's application for delayed reconsideration more than four years after the decision in *Moore III*, it did not abuse its discretion in denying the application.

**{¶ 195}** The court of appeals summarily denied Moore's application for the reasons it articulated in *State v. Bunch*, 7th Dist. Mahoning No. 06 MA 106 (Aug. 8, 2013), and *State v. Barnette*, 7th Dist. Mahoning No. 06 MA 135 (Sept. 16, 2013). *State v. Moore*, 7th Dist. Mahoning No. 08 MA 20, 2013-Ohio-5868, ¶ 2. In both of those cases, the court rejected applications for delayed reconsideration in which the applicants asked the court to extend the holdings in *Graham* and *Miller* to prohibit "de facto life sentences" for juveniles. In *Bunch* and *Barnette*, the court found no extraordinary circumstances under App.R. 14(B) for two reasons: the lengthy delay between the *Graham* and *Miller* decisions and the applications for delayed reconsideration and, "most important[ly]," *Graham* and *Miller* were not directly on point and neither this court nor the United States Supreme Court had extended them to de facto life sentences. *Bunch* at 3; *Barnette* at 3.

**{¶ 196}** In *Bunch*, the court stated, "[W]hen appellate courts have found extraordinary circumstances based on binding decisions from higher courts, they have done so when the higher court's case is directly on point." *Bunch* at 3. It reasoned, "[I]f the higher court's binding decision is not directly on point, there would not be an obvious error and, as such, the requisite finding of extraordinary circumstances, to enlarge the time for filing an application for reconsideration, would not be warranted." *Id.*

**{¶ 197}** Any error regarding application of *Graham* and *Miller* to the facts of Moore's case was far from obvious. The majority opinion acknowledges that the defendant in *Graham* was serving a life sentence, and the actual holding in *Graham* states, "The Constitution prohibits the imposition of a *life without parole sentence* on a juvenile offender who did not commit homicide." (Emphasis added.)

74

560 U.S. at 82, 130 S.Ct. 2011, 176 L.Ed.2d 825. *Miller* extended that constitutional prohibition to mandatory *life-without-parole sentences* to juvenile homicide offenders. ___ U.S. ___, 132 S.Ct. at 2464, 183 L.Ed.2d 407. Unlike the defendants in *Graham* and *Miller*, however, Moore did not receive a sentence of life without parole. Rather, having been found guilty of 12 counts and 11 firearm specifications, Moore received multiple, consecutive term-of-years sentences, which added up to a lengthy aggregate prison term. So, even if the considerations underlying *Graham* would support extending that case to lengthy term-of-years sentences, the Supreme Court's decisions in *Graham* and *Miller*, as the Seventh District held in *Bunch* and *Barnette*, are not directly on point.

**{¶ 198}** Here, the majority extrapolates from *Graham* the rule that the Eighth Amendment prohibits the imposition of any sentence on a juvenile—whether designated a life sentence or a term-of-years sentence—that extends beyond the offender's life expectancy and denies the offender a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. But when the court of appeals denied Moore's application for delayed reconsideration, not only had neither this court nor the United States Supreme Court extended *Graham* in the manner that Moore requests, but numerous courts had held that *Graham* does not apply to lengthy term-of-years sentences. *See, e.g., State v. Kasic*, 228 Ariz. 228, 265 P.3d 410, ¶ 20 (Ariz.App.2011); *Henry v. State*, 82 So.3d 1084, 1089 (Fla.App.2012), *quashed*, 175 So.3d 675 (Fla.2015). *See also Goins v. Smith*, N.D.Ohio No. 4:09-CV-1551, 2012 WL 3023306, *6 (July 24, 2012), *aff'd*, 556 Fed.Appx. 434 (6th Cir.2014); *Bunch v. Smith*, 685 F.3d 546, 550 (6th Cir.2012) (denying habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 because *Graham* did not clearly apply to lengthy term-of-years sentence for multiple nonhomicide offenses; *Graham* "did not clearly establish that consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life

without parole"). In its decisions denying applications for delayed reconsideration in *Bunch* and *Barnette*, the Seventh District cited five decisions from other states that refused to extend *Graham* to prohibit lengthy term-of-years sentences, while also acknowledging two decisions from other states that held to the contrary. In any event, there was no clear authority as to whether the holdings of *Graham* and *Miller* extend to lengthy term-of-years sentences like Moore's.

{¶ 199} Finally, Moore did not challenge his sentence based on the Eighth Amendment in *Moore III*. Rather, Moore raised a single assignment of error that his resentencing violated his right to due process. Even accepting the majority's conclusion that Moore's sentence violates the Eighth Amendment to the United States Constitution, *Graham* and *Miller* do not establish an obvious error in the Seventh District's decision upholding Moore's resentencing on due-process grounds. Moore was not entitled to use an application for delayed reconsideration as a substitute for a request that the court consider, in the first instance, an issue that was not previously presented to the court. A court of appeals may not ordinarily consider on a motion for reconsideration an issue that was not previously raised. *Fenton v. Time Warner Entertainment Co.*, 2d Dist. Montgomery No. 19755, 2003-Ohio-6317, ¶ 2, citing Whiteside, *Ohio Appellate Practice* 700 (2003) (author's comment).

{¶ 200} Because *Graham* and *Miller* are not directly on point, because neither this court nor the United States Supreme Court has extended *Graham* and *Miller* to Moore's situation, because case law from across the country conflicts as to whether *Graham* and *Miller* apply to Moore's situation, and because *Moore III* did not include an Eighth Amendment challenge, I cannot conclude that the Seventh District abused its discretion by denying Moore's application for delayed reconsideration. Accordingly, I dissent.

———————————

Paul J. Gains, Mahoning County Prosecuting Attorney, and Ralph M. Rivera, Assistant Prosecuting Attorney, for appellee.

Jones Day and Rachel S. Bloomekatz, for appellant.

Timothy Young, Ohio Public Defender, and Stephen P. Hardwick, Assistant Public Defender, urging reversal for amicus curiae Office of the Ohio Public Defender.

Marsha Levick, urging reversal for amicus curiae Juvenile Law Center.

Jenner & Block, L.L.P., Matthew S. Hellman, and Erica L. Ross, urging reversal for amicus curiae Criminal Law Scholars.

Covington & Burling, L.L.P., Anna P. Engh, and Matthew Kudzin, urging reversal for amici curiae James M. Petro, Nancy Hardin Rogers, and Evelyn Lundberg Stratton.

Pinales, Stachler, Young, Burrell & Crouse Co., L.P.A., and Candace C. Crouse, urging reversal for amicus curiae National Association of Criminal Defense Lawyers.

Sidley Austin, L.L.P., Joseph R. Guerra, Kwaku A. Akowuah, and Jennifer J. Clark; and Vorys, Sater, Seymour & Pease, L.L.P., Alycia N. Broz, and Daniel E. Shuey, in support of neither party, for amici curiae Dr. Beatriz Luna, Dr. Charles Alexander Nelson III, Dr. Silvia Bunge, Dr. Adriana Galván, and Dr. Linda Patia Spear.

Ron O'Brien, Franklin County Prosecuting Attorney, and Seth L. Gilbert, Assistant Prosecuting Attorney, urging affirmance for amicus curiae Ohio Prosecuting Attorney Association.

_____